## STANDARD OIL CO. v. FEDERAL TRADE COMMISSION.

### No. 9215.

United States Court of Appeals
Seventh Circuit.
March 11, 1949.

Weymouth Kirkland, Howard Ellis and W. H. Van Oosterhout, all of Chicago, Ill., Arthur J. Abbott, of Detroit, Mich., Kirkland, Fleming, Green, Martin & Ellis, of Chicago, Ill., and MacMahon, Abbott & Roberts, of Detroit, Mich. (Thomas E. Sunderland, Albert L. Green, and Gordon E. Tappan, all of Chicago, Ill., of counsel), for petitioner.

Cyrus Austin, of New York City, for amicus curiae.

Walter B. Wooden and James W. Cassedy, Assts. to Gen. Counsel, Federal Trade Commission, both of Washington, D. C., W. T. Kelley, Gen. Counsel, of Washington, D. C., for respondent.

Before KERNER, MINTON, and DUFFY, Circuit Judges.

MINTON, Circuit Judge.

The petitioner seeks to review a cease and desist order issued by the respondent ordering it to cease and desist from discriminating in the price of gasoline of the same grade and quality among its customers in violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Price Discrimination Act, 15 U.S. C.A. § 13. The Commission asks the enforcement of its order.

The petitioner contends that the order should not be enforced because, first, the Commission failed to find, and could not have found under the undisputed evidence in this case, that either or any of the purchases involved in such discrimination was in commerce; secondly, that the Commission treated as immaterial the petitioner's conclusive showing that the discrimination made in price was in good faith to meet an equally low price of a competitor, which showing the petitioner asserts is a complete defense. Third, the petitioner contends that:

"Paragraph 6 of the Modified Order directs Standard at its peril to prevent jobbers to whom it sells gasoline and who are in competition with Standard in the resale thereof from reselling to their retail dealers at prices less than Standard's price to its own retail dealers; requires Standard to police, maintain and regulate such competitor's prices on gasoline, title to which passed to the jobbers on delivery by Standard; and subjects Standard retroactively to punishment for contempt should a jobber-competitor fail to maintain such resale prices."

Substantial evidence in this record shows the following facts as found by the Commission. The petitioner's principal office and place of business is located in Chicago, Illinois. It is engaged in the business of refining and distributing gasoline and other petroleum products throughout fourteen states, principally in the Middle West. The petitioner has a refinery at Whiting, Indiana, to which it supplies crude oil from fields located in other states. One of the divisions in which it distributes its products is known as the Detroit Field, which embraces some thirteen counties in southern Michigan, including the city of Detroit. The Detroit Area, as distinguished from the Detroit Field, is confined to the city of Detroit and its suburbs. The petitioner has no refinery in Michigan, and almost all the gasoline it sells and distributes in the Detroit Field is transported by

tankers from its refinery at Whiting through the Great Lakes to the petitioner's marine terminal at River Rouge, outside the city of Detroit. This terminal has a storage tank capacity of sixty-three million gallons. During the summer months, deliveries are made from Whiting weekly and sometimes twice weekly. In the fall, sufficient gasoline is delivered and stored to take care of the estimated requirements during the winter months when navigation on the Great Lakes is closed. The amount of gasoline used in Detroit is fairly constant and can be accurately estimated. During the years from 1936 through 1940, the years here in question, the petitioner supplied 16 to 17% of all the gasoline in the Detroit Area. In addition to the River Rouge tanks, the petitioner operated six bulk plants in the Detroit Area. Practically all of the gasoline sold in the Detroit Area passed through the River Rouge terminal, except that in some instances gas was delivered directly from Whiting by truck and also by the same means to commercial users. Deliveries were made from the River Rouge terminal by tank cars and tank trucks up to February 1, 1940, and thereafter by trucks alone. The delivery trucks were owned and operated or leased and operated by the petitioner through its employees.

The petitioner supplied gasoline to approximately 358 retail service stations, approximately two hundred of which the petitioner owned and leased, and eight of which it leased and subleased. The remaining 150 were independent operators who owned or leased their stations from someone else. The latter had agreements to purchase their entire requirements of Standard Oil gasoline only from the petitioner. While the former had no such agreements, they did not buy gasoline from anyone except the petitioner. The delivery to the retail customers was known as "tank wagon delivery" and was made at a price fixed in Chicago by the petitioner from time to time, known in the trade as the "posted tank-wagon price."

In addition, the petitioner supplied gasoline to four dealers in the Detroit Area, Citrin-Kolb Oil Company, Stikeman Oil Company, Inc., Wayne Oil Company, and Ned's Auto Supply Company, hereinafter sometimes referred to as Citrin, Stikeman, Wayne, and Ned's. These customers were also known as wholesale customers. They had their own storage tanks and trucks for delivery and met the credit qualifications of the petitioner.

During the time in question Citrin, Stikeman, and Wayne sold a substantial portion of their gasoline purchased from the petitioner direct to the public through retail service stations owned and operated by them. Ned's was engaged entirely in the retail sale of gasoline to the public through its own stations. To these last four customers, known, as we have pointed out, as the wholesale customers, the petitioner has discriminated in price by selling its gasoline to them for resale at wholesale and through their own retail stations at a price substantially lower than the prices charged retail purchasers in the Detroit Area for gasoline of the same grade and quality. The petitioner's Red Crown gasoline, its largest selling brand and comprising about ninety per cent of its sales in the Detroit Area, was sold to those four wholesalers at 1½¢ a gallon lower than the prices charged by the petitioner for the same gasoline to other retail dealers in the Detroit Area.

Citrin, in addition to supplying its own stations which sold at retail, from January 1, 1938, to December 31, 1940, sold one million gallons of gasoline annually to Langer and Cohn, who run a chain of service stations, at 1¢ a gallon less than the tank wagon price, and in addition sold another retail service operator at ½¢ a gallon less than the tank wagon price. For a time Citrin also issued special service cards which entitled the holder to a 2¢ a gallon discount on the purchase of gasoline from one of the retail service stations operated by Citrin.

There is no evidence that Wayne ever sold gasoline to retailers at a price lower than the posted tank-wagon price charged by the petitioner to its dealers or that Wayne ever allowed any discounts. The same is true of Stikeman.

Ned's, however, sold at retail exclusively, and it has been its practice since March 7, 1938, to sell to its customers below the

prevailing retail service station price or to give premiums and discounts which result in a price below its posted price.

A lower price at one service station than at another is an important factor in the purchasing public's mind, especially in the price of the petitioner's advertised brands. Any difference in price between two stations selling the same brand of gasoline is very important in influencing the business. The margin of profit between the tank wagon price to a service station and the retail price is small, averaging since November 1, 1939, about 3.3¢ a gallon in the Detroit Area.

In 1937 Ned's was selling the petitioner's Red Crown gasoline to the public at approximately 2¢ a gallon below the prevailing retail service station price, which continued with variations until the latter part of 1939. In 1939 and 1940, when Ned's posted price was the prevailing retail price, it gave premiums and discounts under cover. It has from time to time given commercial discounts of 1 to 2¢ a gallon off the posted tank-wagon price. In 1939, Ned's also issued trading stamps with a value of 2¢ a gallon, which were redeemable in merchandise or gasoline at Ned's stores. Price cutting at Ned's stores has been almost continuous, and this company has been responsible for starting most of the retail price cutting in major brand gasolines in Detroit over a period of several years. This practice of Ned's has caused substantial damage to other retail service station operators selling the petitioner's Red Crown gasoline and also to retail service station operators selling other brands of gasoline.

The price discriminations granted to Ned's, Citrin, Wayne, and Stikeman on gasoline sold by them at retail have given a substantial competitive advantage to these favored dealers in their retail operations over other retailers of gasoline, including retail customers of the petitioner. This competitive advantage is capable of being used and has been used by Ned's and to some extent by Citrin to divert large amounts of business from other gasoline retailers, including customers of the petitioner, with resultant injury to them and to their ability to continue in business and successfully compete with Ned's and Citrin in the retailing of gasoline. The effect of these discriminations in price allowed by the petitioner to Ned's, Citrin, Wayne, and Stikeman has been and may be substantially to lessen competition and to injure, destroy, and prevent competition with each of these four dealers and with their respective customers in the retail sale of gasoline.

There is substantial evidence in this record, and we think it may be assumed to be conclusive, to the effect that the petitioner made its low price to Ned's, Citrin, Wayne, and Stikeman in good faith to meet the lower price of a competitor. The petitioner failed to show that the discriminatory price which it made these four dealers was justified on the basis of any cost savings.

■ The findings of the Commission based upon the substantial evidence above indicated are sufficient to support the Commission's conclusion of law that the discriminatory sales were in commerce. It is not disputed that the petitioner is engaged in commerce, but it is vigorously insisted that commerce ended at the River Rouge plant and the bulk plants in the Detroit Area and that the petitioner's transactions from there on were wholly intrastate. With this we are unable to agree. The break that occurred at River Rouge was a break in transportation but not in the constant stream of commerce that flowed from the Whiting refinery to the petitioner's customers in Michigan. The stream of commerce flowed continuously from the tanks at the refinery to the tankers on the lake; from the tankers to the tanks at River Rouge and the bulk plants in Detroit; and from there into tank cars and tank trucks to the petitioner's customers. There may have been several breaks in transportation in getting from one vehicle or receptacle to the other in completing the commercial transaction of getting the petitioner's gasoline from Whiting into the Detroit territory, but the stream of commerce was never broken, no matter how many receptacles were used on the way. The rest at River Rouge was not like a warehouse where the goods awaited further sale and distribution. Although the gasoline was not brought to River Rouge pursuant to orders already taken, the de-

214

mands of the Michigan territory were fairly constant, and the petitioner's customers' demands could be accurately estimated, so the flow of the stream of commerce kept surging from Whiting to Detroit.

We think this case quite analogous to Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229. In that case, the livestock came by carrier interstate and intrastate into the receiving pens of the stockyards where the animals were fed, watered, and held until sales were consummated, either to the packers who drove them across the street to the packing house, or to the wholesale dealers or feeders who reshipped them. The transportation was broken at the yards. The animals came to rest, but the stream of commerce moved on to final destination; and the stockyards, with its holding pens, was held to be in commerce, just as here the various changes in the manner of movement may have slowed down the stream of commerce between Whiting and Michigan, but never stopped it. The tanks at River Rouge were similar to a "packaging house" on the way to market. The tank cars and trucks were the most convenient "packages" that could be used to complete the distribution of the gasoline. It is unlike Walling v. Goldblatt Bros., 7 Cir., 128 F.2d 778, where the warehouse was only a detached stockroom for retail stores of a retailer. There the stream of commerce ended at the warehouse for the most part. Here it reached at River Rouge only an intermediate stage preliminary to its final disposition to the petitioner's customers.

■ We decline, as the Supreme Court did in Stafford v. Wallace, supra, 258 U.S. at page 519, 42 S.Ct. at page 403, 66 L.Ed. 735, 23 A.L.R. 229, " * * * to defeat this purpose in respect of such a stream and take it out of complete national regulation by a nice and technical inquiry into the noninterstate character of some of its necessary incidents and facilities, when considered alone and without reference to their association with the movement of which they were an essential but subordinate part." After all, as Justice Holmes said in Swift & Company v. United States,

196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L. Ed. 518, " * * * commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business." The modern concept of commerce is one which gives full sweep to the commerce clause of the Constitution within the limits of the implementing statute, a liberal view of the Congressional purpose as expressed in the statute, and a realistic view of what business is doing as it moves across state lines to accomplish its purpose. The late cases support the view that the petitioner's operations are in commerce from the refinery to its customers. Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Binderup v. Pathé Exchange, 263 U.S. 291, 309, 44 S. Ct. 96, 68 L.Ed. 308; Mid-Continent Petroleum Corporation v. Keen, 8 Cir., 157 F.2d 310, 314; Republic Pictures Corporation v. Kappler, 8 Cir., 151 F.2d 543, 545, 162 A. L.R. 228; Walling v. American Stores Co., 3 Cir., 133 F.2d 840.

Now as to the contention that the discriminatory prices here complained of were made in good faith to meet a lower price of a competitor. While the Commission made no finding on this point, it assumed its existence but held, contrary to the petitioner's contention, that this was not a defense.

Prior to June 19, 1936, when the Robinson-Patman Act went into effect, the Clayton Act, Section 2,[1] provided:

"That it shall be unlawful for any person engaged in commerce, * * * either directly or indirectly to discriminate in price between different purchasers of commodities * * * where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce: *Provided,* That nothing herein contained shall prevent discrimination in price between purchasers of commodities on account of differences in the grade, quality, or quantity of the commodity sold, or that makes only due allowance for difference in the cost of selling or transportation, or discrimination in price in the same or different communities made in good faith to meet competition * * *."

[1] 38 Stat. 730, Act Oct. 15, 1914, 15 U.S.C.A. § 13.

Thus it will be seen that a discrimination in price made in good faith to meet competition was a defense under Section 2 of the Clayton Act, as was a showing that the discrimination was made because of cost savings, or proof of the other defenses given by the Act. But since large buyers could always get such price meeting by suppliers to justify a discrimination in price in their favor, the purpose of the Act to avoid such discrimination was easily evaded. Congress sought to change this bypass by changing the discriminatory price, made in good faith to meet the low price of a competitor, from a defense, as it then was, to a procedural aid to enable a seller to overcome the prima facie case made by showing a difference in price to customers in the same community for goods of the same quality. This was done by amending Section 2 of the Clayton Act by Section 2(a) and (b) of the Robinson-Patman Act.[2] The amended Section 2(a) still made it unlawful to make a discriminatory price, as before, and it kept as a defense the cost savings and other defenses of the old Clayton Act, but took out of the defense category the provision for making a lower price to meet competition. As to this, it was provided in Section 2(b) as follows:

"Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

■ This amendment, it is clear, provided that if a discrimination in price were shown, the burden of justifying it was upon the party making the discriminatory price, and he could meet this prima facie case by showing that he acted in good faith to meet the low price of a competitor. That it was not intended as a defense is apparent from the Conference Report resolving the disagreement of the two Houses. The purpose of Congress is so clearly set out in the Conference Report that we quote it as follows:

"The Senate bill contained a further proviso: 'That nothing herein contained shall prevent discrimination in price in the same or different communities made in good faith to meet competition.' This language is found in existing law, and in the opinion of the conferees is one of the obstacles to enforcement of the present Clayton Act. The Senate receded, and the language is stricken. A provision relating to the question of meeting competition, intended to operate only as a rule of evidence in a proceeding before the Federal Trade Commission is included in subsection (b) in the conference text as follows:

"*'Provided, however,* that nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.'" (Congressional Record, June 15, 1936, p. 9414.)

The Chairman of the House Conferees stated on the floor of the House as he presented the Conference Report:

"It is to be noted, however, that this does not set up the meeting of competition as an absolute bar to a charge of discrimination under the bill. It merely permits it to be shown in evidence. This provision is entirely procedural.

\* \* \* \* \* \*

"If this proviso were construed to permit the showing of a competing offer as an absolute bar to liability for discrimination, then it would nullify the act entirely at the very inception of its enforcement, for in nearly every case mass buyers receive similar discriminations from competing sellers

---

[2] 49 Stat. 1526, Act June 19, 1936, 15 U.S.C.A. § 13.

of the same product." (Congressional Record, June 15, 1936, p. 9418.)

The intent of Congress is clear and the language used to express its intent, it seems to us, is not ambiguous. That Section 2(b) is as the Conference Report says it was intended to be, seems to be the view of the Supreme Court as expressed in Federal Trade Comm. v. A. E. Staley Mfg. Co., 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338, which reversed this Court in A. E. Staley Mfg. Co. v. Federal Trade Commission, 7 Cir., 144 F.2d 221, wherein we held the prima facie case had been rebutted. Chief Justice Stone said, 324 U.S. at page 752, 65 S.Ct. at page 974, 89 L.Ed. 1338:

"It will be noted that the defense that the price discriminations were made in order to meet competition, is under the statute a matter of 'rebutting' the Commission's 'prima-facie case.' Prior to the Robinson-Patman amendments, § 2 of the Clayton Act provided that nothing contained in it 'shall prevent' discriminations in price 'made in good faith to meet competition.' The change in language of this exception was for the purpose of making the defense a matter of evidence in each case, raising a question of fact as to whether the competition justified the discrimination."

The showing made here by the petitioner that it made the lower price in good faith to meet competition, we assume, as the Commission apparently did, was made out. The effect of it was to rebut the prima facie case made by the Commission's proof of the petitioner's discriminatory prices. If nothing further appeared in this record, the case might well have ended there. The reason for making the discrimination was effective to rebut the prima facie case in price discrimination, but it still remained a discrimination, and that discrimination affected competition on the retail level among the retail customers of the wholesalers to whom the petitioner has sold. The discrimination in price in favor of the parties in this case, which the petitioner had a right to make as against its competitors, was then used by the petitioner's customers to work havoc among competitors on the retail level. The petitioner had given a club to its wholesalers which they passed on to their retailers to bludgeon their competitors. This is what the Commission is trying to stop, and it is towards the elimination of this evil that the cease and desist order is directed.

The Commission here considered the other evidence as to the effect on competition of this continuing discrimination and found, and it was justified in finding, that the discrimination not only may but did affect competition. There is substantial evidence in this record that the petitioner's favored wholesalers were in a position to do and did do injury to competition. Where as here the discrimination is between purchasers who are in competition, and the competition which is alleged and proved to be injured is among the retail customers of the favored purchasers and other retailers, the fact that the seller's discriminatory price was made to meet his own competition is not controlling. The discrimination continued here and its effect was direct and harmful to competition and was properly condemned by the Commission's order, notwithstanding the petitioner's discrimination in price was made in good faith to meet competition of its own.

The case of Samuel H. Moss, Inc., v. Federal Trade Commission, 2 Cir., 148 F.2d 378, does not, as we understand it, hold that Section 2(b) is a defense in all events. It holds only that a lower price discrimination made in good faith to meet competition, standing alone, may be a defense. If there were no further showing that the lower price lessens or tends to prevent competition, the justification in the discrimination would be made out. But in the instant case, the Commission went further and showed that the petitioner's discrimination in price to its wholesale customers did have the effect to substantially lessen competition or to injure, destroy, or prevent competition. Note, however, that it would have been necessary for the Commission to prove only that such discrimination in price *may* have that effect. Federal Trade Comm. v. Morton Salt Co., 334 U. S. 37, 68 S.Ct. 822, 92 L.Ed. ——. It is not actual injury alone but the prospect reasonably to be expected of injury to competition which the statute seeks to prevent.

We agree with the Commission that the showing of the petitioner that it made the discriminatory price in good faith to meet competition is not controlling in view of the very substantial evidence that its discrimination was used to affect and lessen competition at the retail level.

■ The petitioner objects to Paragraph 6 of the cease and desist order. This paragraph reads as follows:

"6. By selling such gasoline to any jobber or wholesaler at a price lower than the price which respondent charges its retailer-customers who in fact compete in the sale and distribution of such gasoline with the retailer-customers of such jobbers or wholesalers, where such jobber or wholesaler resells such gasoline to any of its said retailer-customers at less than respondent's posted tank-wagon price or directly or indirectly grants to any such retailer-customer any discounts, rebates, allowances, services or facilities having the net effect of a reduction in price to the retailer."

This paragraph is intended to eliminate the effects of the discriminatory price made to these customers, Citrin, Wayne, and Stikeman, who do a wholesale business. To avoid the force of this paragraph, the petitioner may do one of two things. First, discontinue selling to wholesalers at a price different than that made to retailers. The petitioner's three largest competitors in Detroit have found it agreeable to do so. The petitioner argues that this is an elimination of wholesalers. If this be true, it is elimination only where their existence cannot be justified except on the exploitation of a differential in price not justified by any cost savings to obtain that price. This does not impress us as either illegal, unwarranted, or unjust.

Secondly, the petitioner may under the right to choose its customers refuse to sell to wholesalers who sell to retailers below the price the petitioner makes to its own retailers. The petitioner does not have to make price control agreements with anyone. It has only to govern its own conduct to avoid the impact of an unlawful discrimination. To govern its conduct, the order makes the petitioner deal with its wholesalers at its peril as to what they might do with the gasoline in the future. The petitioner has no control and can have no control over the price of the gasoline after it is sold to the wholesalers. The latter may put any price on it they may choose. They may give it away if they like. The petitioner should not be required to police its wholesalers and to sell to them at the petitioner's peril. The petitioner should be liable if it sells to a wholesaler it knows or ought to have known is engaging in or intends to engage in the competitive practices condemned by this proceeding. Under the order as drawn, the petitioner would be liable if afterwards the wholesaler should resell at a price lower than the petitioner charged its retailers. If the petitioner is to be hailed into court for a violation of the Commission's order, the petitioner must be guilty of knowingly choosing a customer who is using or intends to use its price advantage to undersell the petitioner in its prices made to its retailers.

We would modify Paragraph 6 to read as follows:

"By selling such gasoline to any jobber or wholesaler at a price lower than the price which respondent charges its retailer-customers who in fact compete in the sale and distribution of such gasoline with the retailer-customers of such jobbers or wholesalers, where such jobber or wholesaler, to the knowledge of the respondent or under such circumstances as are reasonably calculated to impute knowledge to the respondent, resells such gasoline or intends to resell the same to any of its said retailer-customers at less than respondent's posted tank-wagon price or directly or indirectly grants to any such retailer-customer any discounts, rebates, allowances, services or facilities having the net effect of a reduction in price to the retailer."

The order as modified will be enforced, and judgment thereon will be entered accordingly.