**WILLIAMSON et al. v. SOLOMON et al.**
**Civ. No. 428.**

United States District Court
E. D. North Carolina,
Wilmington Division.

Jan. 26, 1953.

W. P. Burkhimer, Wilmington, N. C., for plaintiffs.

Stevens, Burgwin & McGhee, Wilmington, N. C., for defendants.

GILLIAM, District Judge.

Plaintiffs have brought this action seeking overtime wages, penalties, attorneys' fees and costs under the Fair Labor Standards Act of 1938, § 1 et seq., as amended, 29 U.S.C.A. § 201 et seq.

Each of the plaintiffs was formerly employed by the defendant Sigmund Solomon, the sole proprietor of Port City Iron Works. The period for which plaintiffs seek overtime wages and other relief extended from January 1, 1947 through February 1, 1951. The action against I. W. Solomon was dismissed by plaintiffs in the course of trial.

Port City Iron Works is a relatively small machine shop located in the city of Wilmington, North Carolina. This company, a service establishment, is engaged in the general repair of all kinds of business, farm and industrial equipment in and around Wilmington; but the greater part of its services are rendered on industrial equipment. Virtually all of the repair work performed is in the nature of welding, lathe work, and reconstruction of equipment parts from pieces of structural steel.

As a coastal city at the mouth of a navigable river, Wilmington is recognized as a center of export and import trade. And foremost in that trade is the function of receiving large oil and gasoline tankers bringing their cargoes from the states of Louisiana and Texas. Several of the nation's major oil companies maintain numerous high capacity bulk tanks in the Wilmington area for the storage of oil and gasoline. From these bulk tanks the fuels are transported by rail, river barges, and tank trucks to the several wholesale distributors of each oil company, and from the storage tanks of those distributors to the retail service stations.

Each of the plaintiffs, with the exception of Williamson, supports his claim for relief principally upon the contention that he was engaged in repair work a substantial part of which was on tank trucks which were allegedly engaged in interstate commerce. This contention is supported by the testimony of five plaintiffs, the combined effect of which is that they did general repair work, that most of their time was consumed on tank trucks, and that there was hardly a day on which there was not a tank truck in the shop.

Plaintiffs introduced in evidence the names of several of the firms that are customers of the defendants and are the owners of the tank trucks on which the plaintiffs performed repair services. Also there were introduced the names of several customers other than tank truck firms; however, in both instances the evidence was entirely insufficient to show a general interstate nature of those businesses. Therefore, the plaintiffs must stand or fall with the evidence before the court which tends to prove an interstate identity of the fuel cargoes that the tank trucks may have carried. Representatives from the Wilmington terminals of Gulf Oil and Shell Oil testified that all of the tank trucks carrying their products out of Wilmington are owned either by independent contract haulers or by the particular wholesale distributor for whom the cargo is destined. The names of those contract haulers mentioned by the oil company representatives were among those recited by the plaintiffs as being customers of the defendants; and their trucks were, as intimated earlier, the very subjects of a part of the labor of the plaintiffs.

 Now, in order to effect a recovery under the Fair Labor Standards Act the plaintiffs must bear the burden of proving that they were "engaged in commerce or in the production of goods for commerce". Warren-Bradshaw Drilling Co. v. Hall, 1942, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83. Also, it is the nature of the duties of the employee himself that governs whether he is entitled to the benefits of the Act. Overstreet v. North Shore Corporation, 1943, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656.

This Court is of the opinion that the plaintiffs were not engaged "in the production of goods for commerce". Mennicucci v. F. & P. Brakelyne Service, Inc., D.C., 1945, 58 F.Supp. 720. The Act itself distinguishes between those "engaged in commerce" and those "in the production of goods for commerce". Further, the same distinction has been recognized through court decisions. Compare McLeod v. Threlkeld, 1943, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538, with Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638. Hence, to prevail, the plaintiffs must prove that their activities were such that they were "engaged in commerce".

This brings the Court to an inquiry regarding a body of law that is characterized by apparent discord. On the one hand, and favorable to the plaintiffs' viewpoint, are the cases which hold that fuel having reached a bulk tank within a state does not

lose its interstate identity until it is delivered into the possession of a customer. Keen v. Mid-Continent Petroleum Corp., D.C., 1946, 63 F.Supp. 120, Id., 8 Cir., 157 F.2d 310; Midland Oil Co. v. Sinclair Refining Co., D.C., 1941, 41 F.Supp. 436. On the other hand are cases holding that the interstate identity of the fuel ceases upon its being deposited in the bulk tanks within a given state where none of the fuel will thereafter be distributed outside of that state. Atlantic Coast Line Railroad Co. v. Standard Oil Co. of Kentucky, 1927, 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270; Daly v. Citrin, D.C., 1943, 53 F.Supp. 876; Lewis v. Shell Oil Co., D.C., 1943, 50 F.Supp. 547. Admittedly, the above statements grossly oversimplify the holdings of the cases cited; however, the end results are substantially as stated.

On appeal, the Court in the Mid-Continent case, supra, seems to rely at least to some extent upon the dictum from the leading case of Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 336, 87 L.Ed. 460. In the Jacksonville Paper Co. case the Court dealt with the interstate identity of goods that were procured, received, checked, temporarily stored, and delivered by warehouse employees, where those goods were the subject of prior specific orders or pre-existing contracts or understandings between the retailer and the warehouseman. Then, with regard to goods that were merely stocked in the warehouse in anticipation of the needs of a fairly stable group of retail customers, the Court found the evidence insufficient to prove that such goods were still "in commerce". However, the Court cautioned as follows: "We do not mean to imply that a wholesaler's course of business based on anticipation of needs of specific customers, rather than on prior orders or contracts, might not at times be sufficient to establish that practical continuity in transit necessary to keep a movement of goods 'in commerce' within the meaning of the Act." This dictum, it seems, might alone be enough to require that the cargoes of the tank trucks here in question were still "in commerce" when it is considered that the Court there was

thinking in terms of practical continuity of travel with regard to the functions of a wholesaler, whereas here the fuel cargoes had not yet reached the establishment of the wholesaler.

But this Court need not base its decision on the implications of the above dictum. The fairly recent case of Standard Oil Co. v. Federal Trade Commission, 1950, 173 F.2d 210, Id., 340 U.S. 231, 71 S.Ct. 240, 243, 95 L.Ed. 239, supplies an authoritative answer. While that case, like other cited earlier, deals with litigation arising under an Act other than the Fair Labor Standards Act, it is, nevertheless, entitled to weight in that it represents an expression of the Supreme Court regarding the intended limits of the term "interstate commerce".

The instant case is quite similar to the Standard Oil case in at least one respect. In each the Court is concerned not with fuel on the level of a wholesale distributor, but rather with the fuel enroute to the wholesale distributor from the interstate producer and refiner. The Supreme Court there quoted the language of the Court of Appeals as follows: "Although the gasoline was not brought to River Rouge pursuant to orders already taken, the demands of the Michigan territory were fairly constant, and the petitioner's customers' demands could be accurately estimated, so the flow of the stream of commerce kept surging from Whiting to Detroit." Further, "Such temporary storage of the gasoline as occurs within the Detroit area does not deprive the gasoline of its interstate character." The answer to the present question is made even clearer by comparing the facts and results reached in the Standard Oil Co. case with those in the case of Daly v. Citrin, supra, for the Citrin-Kolb Oil Company was one of the very "jobbers", a wholesale customer, that figured in the Standard Oil Co. case. The fuel had come to rest when it reached Citrin, but it remained in commerce throughout sale and transit to Citrin. By analogy, the temporary storage of the fuels in the instant case at the bulk tanks of the interstate producer and refiner at Wilmington did not deprive the fuels of their

interstate character. By independent knowledge, this Court can take notice that there is such a continual flow of petroleum products into and away from the refinery company terminals at Wilmington as to give effect to the above analogy.

It is considered immaterial that the evidence in the instant case did not clarify whether or not the fuels left Wilmington in the course of a scheme of direct marketing whereby the products are stored in wholesale tanks owned by the refining company and then retailed through outlets owned, leased, or subleased by the refining company. Also, it is immaterial that the tank trucks were vehicles not owned by the refining companies. Neither the point at which the refining company effects its sale nor the identity of the owner of the transporting vehicles is a determining factor in taking away the interstate identity of products moving from an out-of-state producer to the establishment of a wholesaler.

With the question of the interstate identity of the fuels now decided, the Court next proceeds to these questions: Have the plaintiffs "engaged in commerce" by virtue of having repaired trucks hauling cargoes in interstate commerce. And if so, have the plaintiffs proved that a substantial part of their work was in the repair of those trucks.

It is clear that a mechanic engaged in the repair of trucks that are used to transport goods in interstate commerce is himself engaged in interstate commerce, assuming that the requirements as to degree are satisfied. Skidmore v. John J. Casale, Inc., 2 Cir., 1947, 160 F.2d 527. The fact that the Skidmore case may be distinguished by the circumstance of the employer's being the owner of the trucks is not a distinction that should alter the result. In each instance, disregarding the employer, the employee is at work on an "instrumentality of interstate commerce" and is so closely related to the interstate movement that he is "employed in commerce". Overstreet v. North Shore Corp., supra. The case of Boutell v. Walling, 1945, 327 U.S. 463, 66 S.Ct. 631, 633, 90 L.Ed. 786, is somewhat similar to the present action, though to a lesser extent than is the Skidmore case. The plaintiffs in the Boutell case were employees at a garage that was engaged in repairing vehicles operating exclusively in interstate commerce. The Court said: "They are well within the requirement that they be 'actually in or so closely related to the movement of the commerce as to be a part of it.' McLeod v. Threlkeld [supra]." Manifestly, the same rationale is controlling in the instant case; for the only distinguishing circumstance, other than the identity of the employer, is the matter of degree; and that matter presents the separate and material question which is next to be considered.

The undisputed evidence is that during the year 1947, .0195 percent of the dollar volume of the defendants' business was the performance of services on tank trucks. In 1948 the percentage was 2.56 percent; in 1949, 16.08 percent; in 1950, 20 percent. For the same years respectively, the percentages of individual jobs performed on tank trucks with respect to the total yearly number of jobs performed were as follows: .14 percent; 4.9 percent; 12.5 percent; and 14.9 percent. Yet, there is no evidence before the Court which tends to show that the exclusive business of the tank trucks was the transportation of fuels from the Wilmington bulk tanks to wholesale distributors. Further, there is no evidence that might reveal the percentage, in the business of the tank truck firms, that their transportation of fuels from Wilmington bears to their transportation of all fuels from all points. Also, the percentages quoted above take into account not only the four or five tank trucks firms that the oil company representatives stated were carrying their products, but rather they take into account several firms in addition to those recited by the oil company representatives. The exact number of those additional firms is not known because the testimony did not distinguish tank truck customers from other customers; only trade names and percentages were given.

Thus, the Court is called upon by the party having the burden of proof to find from pure conjecture that the transportation of fuels from the Wilmington bulk

tanks by certain given tank truck firms was regular rather than merely sporadic; that such transportation constituted such a substantial part of the truckers' gross business, either in miles, dollars, or jobs undertaken, that a mechanic repairing those trucks was engaged in commerce; and that all of the tank truck firms for whom the plaintiffs and defendants did work were engaged in carrying fuels away from the Wilmington tanks. The Court is not free to make such a finding. While such a finding might well be in accord with actual facts, nevertheless, such facts were not presented in evidence. Clearly, the percentages quoted are decidedly less material if some of the tank truck firms taken into account therein do not carry any oil from the bulk tanks to wholesalers, or if a substantial part of the business of each or some of the tank truck firms was the intrastate transportation of fuels.

It is worth mentioning that the defendants, in their pleadings, interposed the defense that they were exempt from the operation of the Act by virtue of their employees' being engaged in a retail of service establishment the greater part of whose selling or servicing is in intrastate commerce. 29 U.S.C.A. § 213(a)(2). However, that defense could not be considered by the Court in that the defendants did not bear the burden of proving the nature of the businesses of the requisite proportion of their customers.

In conclusion, the Court is satisfied that each of the plaintiffs, with the exception of Williamson, performed work on tank trucks in substantially the same percentages as that type of work bore to the total work performed in defendants' shop. The Court is further satisfied that the oil moving from the bulk tanks to wholesale distributors by way of tank trucks was still in interstate commerce. But the plaintiffs have failed to prove that all or a substantial part of defendants' tank truck customers were engaged in the transportation of fuels out of Wilmington to wholesalers; and they have failed to show what percentage of the business of the named tank truck customers was interstate commerce business. Therefore, plaintiffs have not shown that they are entitled to a recovery and a decree should be entered accordingly. Defendants' counsel will present an appropriate decree.