**HARDRIVES CO., Inc., and Montgomery-Barnett Construction Corp., Appellants,**

v.

**EAST COAST ASPHALT CORP., R. H. Wright, Inc., and South Florida Asphalt, Inc., Appellees.**

**No. 19864.**

United States Court of Appeals Fifth Circuit.

March 26, 1964.

Rehearing Denied June 10, 1964.

See also 5 Cir., 329 F.2d 871.

C. Shelby Dale, Carl V. Wisner, Jr., Fort Lauderdale, Fla., for appellants Hardrives Co., Inc., and Montgomery-Barnett Construction Corp.

Thomas H. Anderson, Richard M. White, Shutts, Bowen, Simmons, Prevatt & Boureau, Anderson & Nadeau, Miami, Fla., for appellee R. H. Wright, Inc.

Harrison D. Griffin, Kelley, Tompkins & Griffin, Fort Lauderdale, Fla., Earl D. Waldin, Jr., Smathers & Thompson, Miami, Fla., for appellee.

Before TUTTLE, Chief Judge, and WISDOM and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

The appellants, two Florida paving contractors and users of "hot mix asphalt", brought this action against the defendants, three Florida companies engaged in the business of manufacturing and selling "hot mix asphalt" and other paving materials, seeking an injunction and treble damages under the Sherman and Clayton Acts, Title 15, U.S.C.A. §§ 15 and 26. This is a related case to United States v. South Florida Asphalt Company, et al., No. 19635, decided this same date, 5 Cir., 329 F.2d 860. The complaint here alleges the same combination and conspiracy in restraint of trade in a civil action that is the subject of the criminal information at issue in the South Florida case.

Among other things, it is alleged that the business of each of the parties and the activities of each in such business is within and directly affects interstate commerce; that the defendants in furtherance of a combination, conspiracy and agreement have "fixed" the prices on "hot mix asphalt" sold by them to the appellants; and have divided the market for sales of hot mix asphalt amongst themselves, all to the damage of appellants and in violation of the Sherman Antitrust Act. The complaint further alleged that one of the components used by the defendants in the manufacture of hot mix asphalt is bitumen, a petroleum product shipped into Florida from Venezuela and other places outside of Florida; that the hot mix asphalt sold by the defendants is used by the appellants in the paving of streets, highways and roads which inter-connect with highways leading to states outside of Florida, and which are used in interstate travel.

The court conducted a hearing on the jurisdictional question of whether or not the transactions involved interstate commerce within the meaning of the Sherman Act after which he entered a final judgment dismissing the complaint with prejudice. The court stated in his findings of fact that "the ingredients alleged to have been shipped in interstate commerce * * * came to rest", and "the interstate character of those ingredients was lost prior to their purchase by the defendants." "Also jurisdiction does not attach even if it should be assumed that hot mix asphalt * * * was at some stage subsequent to its sale by the importer, applied as topping on roads that were a pattern of the system of interstate highways in Florida and elsewhere."

The following facts were brought out at the hearing. Shell Oil Company ships bitumen into Florida from Venezuela and elsewhere in ocean-going tankers. The bitumen is discharged into tanks owned by a third party at Port Everglades where it is, (1) blended to meet certain viscosity specifications set by the state; and (2) stored until sold to users such as the appellants here. From the time it leaves the foreign port until the time it is applied to the roads, includ-

ing the time it is in transit and the storage period in the Port Everglades tanks, the bitumen is kept hot and in a liquid or "flow" state. Shell Oil, the importer, continues to own the bitumen while it is in the storage tanks at Port Everglades up until the time that sale and delivery is made to the appellants. Ocean tankers replenish the storage tanks at intervals approximating one month.

Although some of the early cases did require a continued uninterrupted flow of the commodity in question, from the time of its entry into the state until its ultimate consumption, in order to be "in commerce", we read the later cases to have modified this rule. In Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943), the Supreme Court in referring to the meaning of "in commerce" as used in the Fair Labor Standards Act, said:

> "The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer 'in commerce' within the meaning of the act * * if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destination, they remain 'in commerce'."

In Pevely Dairy Co. v. United States, 8 Cir., 1949, 178 F.2d 363, in response to the contention that an interruption in the flow had taken away the "in commerce" nature of the commodity, the court said:

> "* * * * It was the expectation of both the producers and the handlers that the milk would be shipped in interstate commerce and we are of the view that the fluid milk thus shipped in interstate commerce remained in that commerce until it reached the ultimate consumers."

See also Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328.

This concept of a continued "in commerce character" in spite of a halt at a warehouse or storage facilities seems to have been more readily adopted in cases involving a shipment in response to a special order. However, where the circumstances under which the shipment was made are such as to nearly equate shipment in response to an order, the courts have also held that the temporary halt did not break the chain of commerce. In Standard Oil Co. v. F. T. C., 7 Cir., 173 F.2d 210, 213, the court stated:

> "Although the gasoline was not brought to River Rouge pursuant to orders already taken, the demands of the Michigan territory were fairly constant, and the petitioners customer's demands could be accurately estimated, so the flow of the stream of commerce kept surging from Whiting [Indiana] to Detroit [Michigan]."

See also United States v. General Motors, 7 Cir., 121 F.2d 376.

Justice Holmes initiated this realistic approach to the problem of what is "in commerce" in Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518, when he recognized that "commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business." Since that time the majority of the cases have looked to the ultimate disposition of the product contemplated by the parties involved prior to the "halt" in the flow. Northern Cal. Pharmaceutical Assoc. v. United States, 9 Cir. 1962, 306 F.2d 379; and Pevely Dairy Co. v. United States, supra. In the present case, all the parties contemplated that the bitumen—or at least a substantial portion of it—would ultimately wind up as topping on the roads and streets of Florida.

Defendant Wright contends that it stands in a different position from the other defendants in that it purchased bitumen from American Oil and not from Shell Oil, the importer. American and Shell had an arrangement whereby Shell would allow American, who had no stor-

age facilities at Port Everglades, to sell up to 20,000 tons of bitumen per year from Shell's storage facilities there in exchange for American allowing Shell the same privilege at other places. Title to the bitumen sold by American at Port Everglades was said to pass from Shell to American at the moment the bitumen was drawn from the storage and blending tanks into the carriers who were to deliver it to the users. At the very same instant, title passed from American to the purchasing user. We find nothing unlawful in the arrangement between Shell and American. The arrangement simply allowed the two companies to compete in areas where only one of them had port facilities. This course of dealing amounts to no more than a mere bookkeeping distinction insofar as a determination of the "in commerce" character of the bitumen is concerned. We hold that the bitumen purchased by the defendant Wright retained its "in commerce" character as well as that purchased directly from the importer by the other defendants.

■ Finally, the appellant Montgomery urges that:

"6. The Court erred in dismissing the claim of Montgomery-Barnett Construction Corp. against South Florida Asphalt, Inc. in that, even if Montgomery-Barnett Construction Corp. did add the price increase to its sale price to customers, it is not barred from proving damages for loss of profit from loss of business."

As we read the record, Montgomery's claim was not dismissed, although the District Court did enter a partial summary judgment against Appellant Montgomery, stating "there is no genuine issue as to the absence of said plaintiff's damages * * * the alleged over charges in the sum of $23,661.02 were passed on to plaintiff's customers * * * and as to that part of its claim it is ordered and adjudged that the Plaintiff * * * take nothing by this lawsuit. As to the

other damages claimed by the Plaintiff, the Defendant's motion is denied at this time. * * * " Had the case ever gotten to the issue of damages, Montgomery would have been free to prove damages for loss of profit from the loss of business.

Accordingly, the judgment is reversed and rendered with respect to the issue of interstate commerce, and remanded for trial on the issues of price fixing, other alleged violations of the act, and damages claimed.