377 F.2d 901
 Kenneth A. BURKE, dba Ranch Acres Liquors, J. A. Chandler,
Jr., dba Chandler Retail Liquors, William E. Manley dba
Twenty-First & Harvard Liquor Store, Jesse B. Renick dba
Pennington Hills Liquor Store, Sarah Simpson Keel dba
Warehouse Liquor Store, and C. J. Wright, Jr., dba Wright's
Beverage Store, Appellants,
v.
Clarence FORD and Frank J. Kunc, dba All Brands Sales
Company et al.,Appellees.
 No. 8662.
 United States Court of Appeals Tenth Circuit.
 May 15, 1967.
 
 Robert S. Rizley, Tulsa, Okl., for appellants.
 Irvine E. Ungerman and James L. Kincaid, Tulsa, Okl. (William Leiter, Tulsa, Okl., and David C. Johnston, Jr., Oklahoma City, Okl., with them on brief), for appellees.
 Before MURRAH, Chief Judge, and BREITENSTEIN and HILL, Circuit Judges.
 MURRAH, Chief Judge.
 
 
 1
 A group of Oklahoma liquor retailers brought this suit to enjoin an alleged market division violation of 1 of the Sherman Act, 15 U.S.C. 1. The retailers alleged that the sixteen Oklahoma wholesalers conspired to and did in the early part of 1964 divide the Oklahoma wholesale liquor market, both territorially and according to brands. Specifically, it was alleged that the defendants conspired to unlawfully divide the wholesale market in alcoholic beverages transported in a continual flow of interstate commerce from other states into Oklahoma for resale to Oklahoma retailers and ultimately to the Oklahoma consuming public. There was also language in the complaint which could be taken as an allegation that even if the interstate movement of alcoholic beverages terminated at the wholesale warehouse, the conspiracy nevertheless adversely affected the free flow of interstate trade and commerce in the commodity. Trial was to the court. Judge Bohanon found that there had been a division of brands and territories. But, he also found that the evidence fell short of proving an unlawful conspiracy or understanding to divide those brands and territories; that the Sherman Act prerequisite involvement with interstate commerce was also lacking; that since in any event market division had admittedly ceased by the time of trial there were no acts or threatened acts to enjoin and the matter of an injunction was, therefore, moot.[1] Judgment was entered for the wholesalers. We affirm on the sole ground that the proof was entirely insufficient to show that the activities complained of were in or adversely affected interstate commerce.
 
 
 2
 Some exposition of the market division found by the trial court may provide helpful background to our consideration of the interstate commerce issue. The record reveals that during most of 1964 the wholesalers confined themselves to selling within more or less well defined geographical areas and that within those areas they confined themselves, at least insofar as the leading brands of liquor are concerned, to selling certain labels. More specifically, it appears that the six wholesalers from Oklahoma City sold in one area, the six from Tulsa in a second, the two from Lawton in a third and the two from Ponca City and Enid in a fourth. In the latter two areas the brands were fairly evenly divided between the two wholesalers operating in each; in the former two areas, serviced by six wholesalers, the brands were usually divided three ways so that within the area any one brand was carried by only two wholesalers. There may have been occasional voluntary deviations from this mode of operation, but the 'voluntary franchise' system, as it became popularly known and as we have set it out, was the normal of doing business during the period in question. This mode of operation ceased in November or December of 1964 about the time two other wholesalers commenced operation and also about the time this case was nearing trial.
 
 
 3
 Addressing ourselves to the threshold question of interstate commerce, we consider first the retailers' primary contention based on the alleged 'in commerce' or continuous flow theory of their case. The retailers point out that all alcoholic beverages[2] consumed in Oklahoma are imported from out of state,[3] and argue that the liquor passes from distiller to wholesaler to retailer to consumer in one continuous flow; that not until it reaches the consumer does the flow terminate; and that, therefore, the alleged conspiracy to divide the wholesale market operated upon the goods while still in interstate commerce. The trial judge held otherwise. He referred to the statutes regulating the Oklahoma liquor industry, 37 O.S. 1961, 501-570, and the implementing rules and regulations of the Oklahoma Alcoholic Beverages Control Board under which liquor coming from out of state is required to be received into the wholesale warehouse where it is subject to strict inventory reporting requirements and where it remains for varying lengths of time until shipped out pursuant to retail order. From this he concluded that interstate commerce in the alcoholic beverages ended when they came to rest in the wholesale warehouse and subsequent transfers were in intrastate commerce.
 
 
 4
 It cannot be doubted that liquor consumed in Oklahoma remains for varying lengths of time in the wholesale warehouse. The question, as we shall see, is whether its interstate movement ends there or whether this coming to rest is but a temporary stopover in a continual flow of commerce which terminates at some point further down the distribution line.
 
 
 5
 We hold that the decision on the in commerce issue is controlled by Walling v. Jacksonville Paper Company, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460. Although that was a Fair Labor Standards Act case, it is basic that the reach of the Sherman Act and the Fair Labor Standards Act is coextensive insofar as the regulation of goods moving in commerce is converned-- in enacting both statutes Congress exerted the full measure of its in commerce powers. Cf. Walling v. Jacksonville Paper Company, supra, and Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, with United States v. Frankfort Distilleries, 324 U.S. 293,[4] 65 S.Ct. 661, 89 L.Ed. 951.
 
 
 6
 Mr. Justice Douglas in Walling described the fullness of the exertion of the congressional power to regulate goods moving in interstate commerce by declaring that
 
 
 7
 '* * * once the goods (enter) the channels of interstate commerce, (there is no indication that) Congress stopped short of control over the entire movement of them until their interstate journey was ended. No ritual of placing goods in a warehouse can be allowed to defeat that purpose. The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer 'in commerce' within the meaning of the Act. * * * if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers for whom they are intended. That is sufficient. Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce.'
 
 
 8
 The retailers adopt this language as a charter for their lawsuit and contend that there is a 'practical continuity of movement' of the liquor until it reaches the Oklahoma consumer for whom it is intended; that the temporary stoppage of the liquor in the wholesale warehouse is only a convenient intermediate step in its contemplated interstate movement. But, Mr. Justice Douglas did not stop with his basic statement of principles which as a general statement does support the retailers position. He proceeded to particularize in three categories the special circumstances under which goods moving from out of state to an in state wholesaler for redistribution in state may be said to have the requisite practical continuity of an interstate movement. Included are goods purchased by wholesalers (1) to fill a special order, (2) under a contract or understanding by which the wholesaler has agreed to fill the needs of a particular customer, or (3) to fill the anticipated needs of a particular customer although no contract or understanding to do so exists. The evidence was clear in Walling that the respondent handled certain goods coming within the first two categories, and the court held that employees working on such goods were covered by the Act. But, crucially apropos our case, the court found the evidence insufficient to show that another mass of goods fell within the third category, i.e. goods purchased without a contract or understanding but in anticipation of the needs of a specific customer. As to these controversial goods, the court thought the evidence was '* * * of a wholly general character and (lacked) that particularity necessary to show that the goods in question were different from goods acquired and held by a local merchant for local disposition.'
 
 
 9
 A number of later cases relied upon by the retailers are entirely compatible with Walling. Thus in United States v. Chrysler Corp. etc., 9 Cir., 180 F.2d 557, the court, citing and quoting from Walling, held the indictment legally sufficient to bring wholesale transactions in certain goods within the first two Walling categories; as to other transactions, the indictment was thought not clearly sufficient to bring them within the third Walling category. The court proceeded to determine whether it was sufficiently alleged that these latter transactions adversely affected commerce so as to bring them within the scope of the Sherman Act. See also United States v. South Florida Asphalt Co., 5 Cir., 329 F.2d 860. Heavy reliance is placed on Las Vegas Merchant Plumbing Ass'n v. United States, 9 Cir., 210 F.2d 732. In that case the indictment alleged a conspiracy to restrain the free flow of goods in commerce and alternatively alleged that if the activities were purely local, they adversely affected the free flow of goods in commerce. There was evidence that goods were shipped to the wholesaler to fill special orders placed with him by the conspiring plumbers. Goods were also shipped by the manufacturer to the conspiring plumbers on direct order. Still other goods were shipped to the wholesaler for general resale. The court found the evidence entirely sufficient to support the trade and commerce elements of the offense without specifying which particular line of evidence supported the alternative theories of the indictment.
 
 
 10
 Several other cases cited in neither brief require some discussion. Standard Oil Co. v. F.T.C., 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239, is entirely consistent with Walling, i.e. see footnote 6, P. 238. Not only did the gasoline remain Standard's property after it was shipped from Indiana to Detroit and was stored to await wintertime sale, but the court was careful to note that Standard could accurately estimate the demands of its Detroit customers. Thus the gasoline clearly came within the third Walling category. Indeed, Judge Minton then on the Seventh Circuit, was at pains to point out when the case was before that court that 'The rest at River Rouge was not like a warehouse where the goods awaited further sale and distribution.' Id. 173 F.2d 210, 213. The cases of Pevely Dairy Co. v. United States, 8 Cir., 178 F.2d 363; Foremost Dairies, Inc. v. F.T.C., 5 Cir., 348 F.2d 674; Hardrives Co. v. East Coast Asphalt Corp., 5 Cir., 329 F.2d 868; and Northern California Pharmaceutical Ass'n v. United States, 9 Cir., 306 F.2d 379, give us more pause. The two dairy cases both involve situations where milk from out of state was shipped in state to be processed for resale in state. It was not argued that the milk was purchased to meet the anticipated demand of specific customers nor was there any evidence that such was the case. But, interstate commerce was sustained on the premise that milk, a perishable commodity, flowed in a constant stream of commerce through a 'negligible processing operation' to its final destination-- the ultimate consumer. In the Hardrives case the court, after citing and quoting from Walling, held that a private Sherman Act complaint had been erroneously dismissed. The case involved foreign shipments of asphalt into Florida from Venezuela. The asphalt was stored in Florida, then processed by the defendants who either resold it to paving contractors or laid it themselves. The court seems to have reversed solely because ' * * * all the parties contemplated that the bitumen-- or at least a substantial portion of it-- would ultimately wind up as topping on the roads and streets of Florida.' Id. 329 F.2d 870. But, it must be noted that although there was no allegation in Hardrives of purchases to fill the anticipated needs of specific customers, there were such allegations in the related criminal case brought by the Government. See United States v. South Florida Asphalt Co., supra. Finally, in Northern California Pharmaceutical Ass'n v. United States, supra, the court held that drugs shipped direct from out of state manufacturers to in state druggists retained their interstate character while on the pharmacy shelves, the test being '* * * what ultimate disposition of the product is contemplated by the business people involved.' The court does not discuss Walling, although it does refer to United States v. Chrysler Corp. etc., supra, and speaks in terms of 'practical continuity of movement.' Significantly, the facts of the case also indicate that wholesalers made interstate purchases to fill special orders placed with them by retail druggists.
 
 
 11
 It may be that these cases are susceptible of an interpretation which would take them beyond the three Walling categories into the realm of a fourth category in which goods coming to rest on the shelves of the wholesale or retail establishment would remain in the stream of commerce if destined for ultimate general resale to the trade. But, they have not explicitly done so. Appellants do not contend for an extension of Walling, and we are unwilling to go beyond the confines of its third category which in our view was intended to establish the outer limits of the practical continuity movement concept.
 
 
 12
 The court in Walling held that goods shipped interstate to wholesalers for redistribution to the general retail trade did not remain in interstate commerce after coming to rest in the wholesaler's warehouse. So it is in our case. There is no proof of any transaction coming within any of the three categories. Certainly, this record reveals no purchases to fill special orders or purchases pursuant to contract or understanding to fill the needs of specific retailers, and more importantly, there is no evidence whatsoever of non-contractual purchases to fill the anticipated needs of particular customers. The most the record reveals is that the wholesalers met the general demand for alcoholic beverages apparently replenishing their inventories when necessary. We hold that the interstate movement of the liquor ends at the Oklahoma wholesale warehouse. See Brosious v. Pepsi-Cola Co., 3 Cir., 155 F.2d 99; Jewel Tea Co. v. Williams, 10 Cir., 118 F.2d 202; Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172; United States v. San Francisco Electrical Contractors Ass'n, D.C., 57 F.Supp. 57. Cf. Bank of Utah v. Commercial Security Bank, 10 Cir., 369 F.2d 19; Lieberthal v. North Country Lanes, 2 Cir., 332 F.2d 269, and cases cited at p. 271.
 
 
 13
 We now turn to a consideration of the 'affecting commerce' theory. The trial court found as a fact that '* * * interstate commerce was not and has not been affected by any actions of the said defendants', and concluded as a matter of law that '* * * the plaintiffs have failed to prove any alleged agreement or conspiracy which affected interstate commerce as defined by the Sherman Act * * *'. Although this theory was stressed in the trial court, it is not vigorously pressed here. But, there are affecting commerce cases cited, and in view of this and the court's findings, we consider the issue. The proposition that intrastate activities which adversely affect interstate commerce come within the scope of the Sherman Act is established beyond question. See United States v. International Boxing Club, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290; United States v. Shubert, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279; United States v. Women's Sportswear Mfgr's Ass'n, 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed. 805; Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; United States v. Frankfort Distilleries, supra; Lorain Journal v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162. But, in this case there is no importing of raw material and exporting of finished products as in Women's Sportswear; no utilization of interstate means to produce the local restraint as in Frankfort Distilleries;[5] no interstate conspiracy to exploit a local activity as in International Boxing Club and Shubert; no activities, individual or collective, which to the extent they are effective tend to reduce the revenues of a competitor putting him out of an interstate business as in Lorain Journal. And see Bank of Utah v. Commercial Security Bank, supra.
 
 
 14
 The cases closest to this one are those like United States v. Employing Plasterers Assn., 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618, and Mandeville Island Farms v. American Crystal Sugar Co., supra. See also United States v. Sheffield Farms Co., D.C., 43 F.Supp. 1; United States v. Northeast Texas Chapter National Electrical Contractors Ass'n, 5 Cir., 181 F.2d 30; Jewel Tea Co. v. Local Unions, 7 Cir., etc., 274 F.2d 217; Local 167 of Intern. Broth. of Teamsters, etc. v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804. Typically, in the plastering case the allegation was that the effect of the local conspiracy was to restrain the flow of interstate commerce in plastering materials. The court reversed the dismissal of the action holding that the complaint stated a cause of action saying, '* * * it goes too far to say that the Government could not possibly produce enough evidence to show that these local restraints caused unreasonable burdens on the free and uninterrupted flow of plastering materials into Illinois.' United States v. Employing Plasterers Ass'n, supra, 347 U.S. 189, 74 S.Ct. 454.
 
 
 15
 The retailers in this case have utterly failed to prove that if, as we hold, the flow of liquor stopped at the wholesale warehouse, the alleged conspiracy nevertheless adversely affected the flow of liquor into the state. The only pertinent evidence in the record indicates that the net cases shipped to Oklahoma wholesalers increased from 885,976 in 1963 to 891,176 in 1964. If anything, this proves the alleged conspiracy had no effect on the flow of liquor.
 
 
 16
 The retailers seem to rest their case on the hypothesis that the mere fact of market division and the resulting reduction in the number of wholesale outlets available to the respective distillers ipso facto proved the requisite adverse effect on the free flow of liquor in interstate commerce. In other words, they seem to argue that from this single fact we must infer that interstate commerce was adversely affected. But this is not so. The single fact of a reduced number of wholesale outlets does not give rise to the necessary implication that interstate commerce was adversely affected. While a division of the market is to be sure a per se violation of the anti-trust law, i.e. see Addyston Pipe and Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, this postulate presupposes but does not prove the requisite connection with commerce. Even though a trivial impact on interstate commerce may be sufficient to bring the activities complained of within the purview of the Sherman Act, i.e. Cf. Wickard v. Filburn, 317 U.S. 111, 127, 63 S.Ct. 82, 87 L.Ed. 122, there was no proof whatsoever that the alleged conspiratorial market division either deterred the amount of sales distillers could make into Oklahoma or in any way reduced the price at which they could sell. As Judge Bohanon aptly put it, 'The record shows that the Oklahoma sales of liquor continued to increase and grow. There is no proof here that what the defendants did was a deterrent to interstate commerce.'
 
 
 17
 In this posture of the case we do not express any opinion on the other issues raised by the retailers concerning the existence of a conspiracy to divide markets and the mootness of equitable relief.[6]
 
 
 
 [1]
 At the trial, the retailers requested permission to amend their prayer for relief to include damages. They pointed out that they had alleged damages in their complaint, and stated a desire to amend so that if the court found a violation they could go ahead with proof of damages. The wholesalers strenuously objected. No express ruling was made on the request; in any event the prayer was not amended. However, in announcing his decision the court stated at the outset that '* * * early in this case there was the question of injunction. I think, as you mentioned a while ago, Mr. Rizley, that should the court find evidence sufficient to issue an injunction, the question of damages would follow. Notwithstanding that fact, the only pleadings before the Court at this time deal with the request on the part of the Complaint for injunctive relief.' Thus, the court seemed to feel that if liability existed, proof of damages would be in order
 
 
 [2]
 Spirits, wines and cordials
 
 
 [3]
 Purchases by Oklahoma wholesalers in 1964 amounted to some 44-45 million dollars
 
 
 [4]
 While the Fair Labor Standards Act is inapplicable to local activities which affect interstate commerce, the Sherman Act is concerned with activities both in and affecting interstate commerce, i.e. see United States v. Frankfort Distilleries, supra
 
 
 [5]
 The physical movement of alcoholic beverages in Frankfort Distilleries is strikingly similar to the movement in this case. In Frankfort this court, following Walling, held that the interstate shipment ended at the wholesale warehouse. Nor did we think the alleged conspiracy there operated to adversely affect the free and untrammelled flow of interstate commerce. But, the Supreme Court thought otherwise. It held that 'Whatever was the ultimate object of this conspiracy, the means adopted for its accomplishment reached beyond the boundaries of Colorado. The combination concerned itself with the type of contract used in making interstate sale; its coercive power was used to compel the producers of alcoholic beverages outside of Colorado to enter into price maintenance contracts.' United States v. Frankfort Distilleries, supra, 324 U.S. 298, 65 S.Ct. 664. In our case it was neither alleged nor is it argued on appeal that the out of state distributors were in any way connected or involved in the alleged conspiracy-- voluntarily or involuntarily
 
 
 [6]
 The retailers also assign as error the court's failure to find a conspiracy to fix prices. The court made no finding on this issue either way, apparently because no such conspiracy was alleged. No objection was made to his failure to make a finding on the point. In any event, we also expressly refrain from expressing any view on this issue