**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**CADILLAC OVERALL SUPPLY COMPANY, Defendant-Appellant.**

**No. 77–5076.**

United States Court of Appeals,
Fifth Circuit.

Feb. 28, 1978.

Patrick B. McCauley, Detroit, Mich., Michael P. Chase, North Miami Beach, Fla., for defendant-appellant.

Gary D. Flack, Atty., John T. Orr, Jr., Antitrust Division, Dept. of Justice, Atlanta, Ga., Barry Grossman, William D. Coston, John H. Shenefield, Acting Asst. Atty. Gen., Dept. of Justice, Antitrust Div., Washington, D. C., for plaintiff-appellee.

Before THORNBERRY, Circuit Judge, SKELTON, Senior Judge * and HILL, Circuit Judge.

JAMES C. HILL, Circuit Judge:

This is a criminal anti-trust case. Appellant Cadillac Overall Supply Company (Cadillac) appeals, following a bench trial, from the verdict and judgment finding it guilty of conspiring to restrain interstate commerce by allocating customers in the rental of industrial garments in several counties in South Florida in violation of Section One of the Sherman Act. 15 U.S.C. § 1.

Cadillac presents seven enumerations of error. These are:

(1) That the trial court erred in ruling that the indictment sufficiently alleged a restraint of interstate commerce.

(2) That there was insufficient evidence to establish at trial that the restraint occurred in the flow of or substantially affected interstate commerce.

(3) That the evidence was insufficient to establish that the defendant-appellant was a participant in the customer allocation conspiracy.

(4) That the trial court erred in holding that the conspiracy to allocate customers constituted a *per se* violation of the Sherman Act.

(5) That the trial court erred in imputing the acts of the corporate employees to the corporate defendant.

(6) That the trial court erred in admitting into evidence certain records maintained by the defendant's coconspirators.

(7) That the trial court erred in denying the defendant's request to use the prosecutor's witness interview summaries for cross-examination and impeachment in violation of the Jencks Act and the standing discovery order of the District Court.

We affirm.

* Senior Judge of the United States Court of Claims sitting by designation.

Before proceeding to the issues presented, we briefly state the facts necessary for an understanding of this case.

Cadillac Overall Supply Company is a corporation engaged in the industrial garment industry. It supplies uniforms, industrial cloths and other products to its customers on a rental basis. When it secures a new customer, Cadillac must make a capital investment in purchasing the industrial garments which will be ordered according to the style, color, sizes, business and employee names requested by the customer. According to the stipulation of the parties, over 50 percent of the garments ordered are shipped from out of state sources to Cadillac which is located in South Florida.

Following the initial delivery of the garments to the customer, Cadillac performs further services such as laundering the garments on a periodic basis and replacing those which become worn out or damaged. Customers are generally charged according to the number of garments rented and by the frequency with which they must be cleaned.

In the early 1950's only two companies, Neway Uniform and Towel Supply of Florida (Neway) and Mechanics Uniform Service (Mechanics), conducted a significant amount of business in the South Florida market. Initially, both companies competed with each other on an open basis.

However, at some point in the later 1950's, Neway and Mechanics made an agreement whereby each would refrain from encouraging the other's customers from changing over to it. In addition to refraining from soliciting the other's customers, the arrangement called for active discouragement of the customer from changing suppliers. For example, if a customer of Neway expressed to a Mechanics agent that it was dissatisfied with the services rendered by Neway and was contemplating a change to Mechanics as a supplier, the sales manager of Mechanics would call the manager of Neway and inform him of the customer's complaint. Mechanics would cooperate with Neway, encourage Neway to satisfy the customers complaint, and try to discourage the customer, by means of increased price or the like, from changing over to Mechanics.

If a dissatisfied customer would still insist on changing suppliers, and ultimately did so, the managers of the suppliers would meet and trade customer accounts until the volume of business exchanged was equivalent. For example, if Neway had lost a customer to Mechanics, despite their joint efforts to the contrary, Neway would accept the account of a disgruntled Mechanics customer.

In the 1960's the evidence established that Uniforms for Industry joined the arrangement. Later in the 1960's American Uniform Service, Sanitary Uniform Rental Service Co., and Cascade Linen Services joined the arrangement.

In 1960, Cadillac Overall Supply Company, headquartered in Detroit, Michigan, acquired the assets of Atlantic Coverall Supply Company and entered the South Florida market.

In a finding, which we shall review, the trial judge found that Cadillac also joined the customer allocation conspiracy and engaged in the nonsolicitation and account balancing scheme.

I. *Was a Restraint on Interstate Commerce Alleged?*

In its first enumeration of error, appellant contends that the indictment failed to allege a restraint by the appellant on interstate commerce in violation of the Sherman Act.

In this case, the indictment charged that the defendant and its co-conspirators by entering into the customer allocation arrangement had unreasonably restrained interstate commerce. The indictment stated that the effects of the conspiracy were to curtail competition in the uniform rental industry, restrict the free choice of the consumer, and stabilize prices at an artificial and noncompetitive level. The indictment more specifically alleged that:

Uniform rental companies located in South Florida regularly purchase or oth-

erwise obtain for the use of their customers industrial garments from manufacturers whose plants are located outside of the state of Florida. Defendants purchase substantial quantities of cleansing supplies and packaging materials from suppliers located outside the state of Florida. Thus, during the period covered by this indictment, there was a continuous and uninterrupted flow of industrial garments, cleansing supplies and packaging materials from plants located in states other than Florida to uniform rental companies, including the defendants, within the state of Florida, and then to their customers.

■ In reviewing the sufficiency of an indictment, we must view the document in a practical sense, and as a whole, *United States v. Smith*, 523 F.2d 771 (5th Cir. 1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976) to determine whether it sets forth the elements of the offense charged in order that the constitutional right of the defendant not to be placed in double jeopardy will be insured and so that the right of the defendant to be informed of the accusation may be afforded. *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Driscoll*, 454 F.2d 792 (5th Cir. 1972). Fed.R.Crim.P. Rule 7.

In this Circuit, we have held that, ordinarily, the pleading of the allegations in terms of the statute is sufficient to fulfill this dual requirement. *United States v. Lester*, 541 F.2d 499 (5th Cir. 1976).

■ Under Section 1 of the Sherman Act, two theories may be used to satisfy the requisite and jurisdictional interstate commerce nexus. These theories are the "affecting commerce" and "flow of commerce" theories. *Mandeville Island Farms Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); *Las Vegas Merchant Plumbers Ass'n v. United States*, 210 F.2d 732 (9th Cir. 1954).

■ In the instant case, our review of the sixth allegation of the indictment, when read in light of the above standards, con-vinces us that the indictment sufficiently alleged a restraint on interstate commerce under the "flow of commerce" theory.

While the indictment was somewhat conclusory in alleging the effect of the defendant's actions on interstate commerce, we hold that the indictment, when read as a whole and in a practical sense, adequately informed the defendant of the charges against it and was sufficient to protect the defendant from double jeopardy. The defendant has failed to show any prejudice flowing from any lack of specificity. *United States v. Gates*, 528 F.2d 1045 (5th Cir. 1976), *cert. denied*, 429 U.S. 839, 97 S.Ct. 110, 50 L.Ed.2d 106 (1976).

■ It must be remembered that in testing the sufficiency of an indictment, a court must not pierce the pleadings and make a premature resolution of the merits of the allegations. *See United States v. South Florida Asphalt Company*, 329 F.2d 860 (5th Cir. 1964). Rather, as when confronted with a motion to dismiss a civil complaint for failure to state a claim, the court must look to the allegations and, taking the allegations to be true, determine whether a criminal offense has been stated.

Appellants' reliance on the case of *United States v. Allied Maintenance Corp.*, 1976–1 Trade Cases § 60,924 (S.D.N.Y.1976), is misplaced. Our reading of the case indicates that the Court substituted its prediction of the outcome on the merits rather than determining whether the allegations, accepted as true, stated a violation of the Sherman Act. We therefore decline to accept appellants' suggestion that we adopt the *Allied Maintenance* case as authority to dismiss the indictment. Appellants enumeration of error is meritless.

II. *Was a Restraint on Interstate Commerce Proven?*

All parties recognize that the mere pleading of a restraint on interstate commerce is insufficient to sustain a conviction under the Sherman Act. Rather, the Government at trial must prove the existence of such a restraint.

The requirement that a restraint on interstate commerce be present acts as a jurisdictional limitation on the power of Congress, pursuant to the interstate commerce clause of the Constitution, to condemn such an arrangement as that alleged here. *Rasmussen v. American Dairy Association*, 472 F.2d 517 (9th Cir. 1973). Yet, it has repeatedly been recognized that in enacting the Sherman Act, Congress intended to exercise the full sweep of its power in making illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . ." *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 1174, 88 L.Ed. 1440 (1944); *United States v. Frankfort Distilleries, Inc.*, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951 (1945); *Las Vegas Merchant Plumbers Ass'n v. United States*, 210 F.2d 732 (9th Cir. 1954).

In its second enumeration, appellant contends that the Government failed at trial to prove the requisite restraint on interstate commerce. The trial judge, after taking all the evidence, found that such a restraint had been proven. In order to resolve this issue, we must review the evidence and determine whether or not the Government proved a restraint on interstate commerce under either the "flow of commerce" or the "affecting commerce" tests.

Prior to trial, the parties stipulated that Cadillac had purchased over half of its garments and incidental supplies from out-of-state sources. These purchases were in excess of $100,000.00 for the years 1970–1972. Cadillac, it was undisputed, was one of the smaller businesses alleged to have participated in the conspiracy.

When this evidence is coupled with the admission of agents of some of the alleged co-conspirators that the customer allocation scheme had lasted over a decade, the restraint is easily seen to encompass a very large volume of goods moving into South Florida from out-of-state sources.

There is thus no question that a substantial volume of industrial garments and supplies were in the flow of interstate commerce until they reached the appellant and the alleged co-conspirator companies. Under the "flow of commerce" test, the question is at what point along the path from manufacturer to consumer the "flow" might have stopped, thereby rendering any subsequent anti-competitive conduct purely intrastate in nature.

The point at which the flow came to rest is a factual question left initially to the finder of fact. *United States v. Flom*, 558 F.2d 1179 (5th Cir. 1977); *Las Vegas Merchant Plumbers Ass'n v. United States, supra*. When the finder of fact is the trial judge, unless it is clearly erroneous, the finding must stand. *United States v. Rischard*, 471 F.2d 105 (8th Cir. 1973); *United States v. Tallman*, 437 F.2d 1103 (7th Cir. 1971). Here, the trial judge found that the goods remained in the flow of commerce until they were leased to the ultimate consumer.

Appellants' challenge this in a two pronged attack.

First, Cadillac asserts that its business has two separate and distinct aspects. The purchase and receiving of the industrial garments from out-of-state suppliers, they admit, is of an interstate nature. However, Cadillac contends that the subsequent rental and laundering services provided to its customers is of a purely intrastate nature and hence beyond the reach of the Sherman Act.

After review of the entire record, we decline to take such a theoretical and unrealistic view of Cadillac's business. The record contains no evidence to rebut the conclusion that Cadillac's entire Florida operation was conducted as a single integrated whole.

The evidence established that Cadillac ordered new garments from out-of-state sources to supply newly retained customers and to replace the rental stock of an existing customer. This evidence strongly supports the view that the business was an integrated operation. We therefore reject this bifurcated approach urged by appellant for the first time on appeal.

In a closely related argument challenging the finding that the flow had not stopped until it reached the customers, appellant contends that the garments had left the stream of commerce when they arrived at and were stored in the company's warehouse. The interstate nexus, it is contended, had thus dissipated when the garments were thereafter delivered for the customer's use.

It has long been established that,

"[t]he entry of goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer 'in commerce' within the meaning of the Act. . . . if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers for whom they are intended. That is sufficient. Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce." *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568, 63 S.Ct. 332, 87 L.Ed. 460 (1942).

Likewise, in this Circuit, we have held that "where the circumstances under which the shipment was made are such as to nearly equate shipment in response to an order, . . . the temporary halt did not break the chain of commerce." *Hardrives Co. v. East Coast Asphalt Corp.*, 329 F.2d 868, 870 (5th Cir. 1964). Taking a practical view of interstate commerce, we must look to the ultimate disposition of the product that is contemplated by the appellant and the industrial garment industry. *Hardrives Co. v. East Coast Asphalt Corp., supra; Northern Cal. Pharmaceutical Assoc. v. United States*, 306 F.2d 379 (9th Cir. 1962).

Recently in *United States v. Flom, supra*, this Court went further and refused to hold that the fabrication of a product, subsequent to its arrival at a warehouse within a state, resulted in the removal of the product from the flow of interstate commerce.

On appeal, Cadillac stresses the dearth of testimony as to the flow of the garments into Florida and onto the lessees. This is easily explained by the pre-trial stipulation entered into between the Government and Cadillac's trial counsel.

In pertinent part, the stipulation states that:

Cadillac Overall Supply Company has regularly purchased substantial quantities of industrial garments for its Florida Division from companies located in Tennessee, Missouri, Michigan, Georgia, Illinois, New Jersey, Oklahoma and New York. The garments were shipped to the Florida Division of Cadillac Overall Supply Company for the use of its customers in South Florida.

Under the mandate of *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we must view the evidence and all reasonable inferences flowing therefrom in the light most favorable to the Government.

In this light, we think the evidence was sufficient to support the finding that the garment remained in the flow of commerce until they reached the consumer-lessees.

As shown above, Cadillac stipulated that garments were ordered from out-of-state sources to supply its customers. The testimony at trial established that when taking on a new customer, Cadillac would have to make an investment in uniforms and the like in order to supply that customer. Likewise, garments would be ordered to replace the worn out stock of existing customers.

The trial judge was of the opinion that the inference to be drawn from the evidence was one of a practical continuity of movement from out-of-state suppliers to the garment lessees: "Now, as to the flow theory, garments simply were being shipped in here, passed through the ordering company and sent out to the Gulf station and the Gulf station unwrapped them and put them on." We share this view of the evidence and hold that the finding of the trial judge, that the garments were "in commerce" un-

til leased to the customers, is not clearly erroneous.

Although we need go no further in finding that interstate commerce was restrained, we shall address the issue as to whether the proof sustained a finding that interstate commerce was substantially affected.

It is well established that a local restraint on intrastate commerce may nevertheless substantially and adversely affect interstate commerce and thus violate Section 1 of the Sherman Act. *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *United States v. Employing Plasterers Ass'n.*, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954).

In its attack on the "affecting commerce" test, Cadillac asserts that since there was no proof of increased prices due to the restraint and no proof that a greater quantity of merchandise would have entered Florida in the absence of the restraint, the alleged customer allocation conspiracy did not substantially and adversely affect interstate commerce. We disagree.

It is well settled that under Section 1 of the Sherman Act, the scrutiny of the Court must be directed to the character of the restraint, not the amount of commerce restrained. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 785, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1976); *United States v. Socony Vacuum Oil Co.*, 310 U.S. 150, 221–223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Recent Supreme Court authority has squarely held that the Sherman Act reaches unsuccessful restraints on interstate commerce as well as those which have not been shown to affect the price of goods or services in the market place. *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

At trial, the testimony revealed that Cadillac's out-of-state products were manufactured in Detroit. The testimony also revealed that the garments of Neway Uniform, a co-conspirator, were manufactured in Cleveland, Ohio. As the Second Circuit observed in *United States v. Consolidated Laundries Corporation*, 291 F.2d 563, 574 (2d Cir. 1961) if conspirators engage in the allocation of customers, the "customer's range of choice and ability to seek out the supplier who could give him better terms is curtailed." 291 F.2d at 572.

Similarly, the Supreme Court in *Burke v. Ford*, 377 F.2d 901 (10th Cir.), *reversed*, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967), has held in the context of horizontal territorial market divisions that, as a matter of practical economics, a substantial adverse affect on interstate commerce results by virtue of the restraint, itself.

In *Burke*, liquor entering the State of Oklahoma was found to have come to rest and not have been in the flow of interstate commerce when it was thereafter sold out of the wholesaler's inventories to liquor retailers.

In rejecting the retailers' contention that the territorial market division substantially and adversely affected interstate commerce, the Tenth Circuit stated:

> The retailers in this case have utterly failed to prove that if, as we hold, the flow of liquor stopped at the wholesale warehouse, the alleged conspiracy nevertheless adversely affected the flow of liquor into the state. The only pertinent evidence in the record indicates that the net cases shipped to Oklahoma wholesalers increased from 885,976 in 1963 to 891,176 in 1964. If anything, this proves the alleged conspiracy had no effect on the flow of liquor.

> The retailers seem to rest their case on the hypothesis that the mere fact of market division and the resulting reduction in the number of wholesale outlets available to the respective distillers *ipso facto* proved the requisite adverse effect on the free flow of liquor in interstate commerce. In other words, they seem to argue that from this single fact we must infer that interstate commerce was adversely affected. But this is not so. The single fact of a reduced number of wholesale outlets does not give rise to the necessary implication that interstate commerce was adversely affected. While a

division of the market is to be sure a per se violation of the anti-trust law, i. e. see *Addyston Pipe and Steel Co. v. United States*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, this postulate presupposes but does not prove the requisite connection with commerce. Even though a trivial impact on interstate commerce may be sufficient to bring the activities complained of within the purview of the Sherman Act, i. e. Cf. *Wickard v. Filburn*, 317 U.S. 111, 127, 63 S.Ct. 82, 87 L.Ed. 122, there was no proof whatsoever that the alleged conspiratorial market division either deterred the amount of sales distillers could make into Oklahoma or in any way reduce the price at which they could sell. As Judge Bohanon aptly put it. 'The record shows that the Oklahoma sales of liquor continued to increase and grow. There is no proof here that what the defendants did was a deterrent to interstate commerce.' 377 F.2d at 907–908.

The Supreme Court reversed per curiam and stated:

The Court of Appeals held that proof of a state-wide wholesalers' market division in the distribution of goods retailed in substantial volume within the State but produced entirely out of the State was not by itself sufficient proof of an effect on interstate commerce. We disagree. *Horizontal territorial divisions almost invariably reduce competition among the participants. Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; *United States v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238. *When competition is reduced, prices increase and unit sales decrease. The wholesalers' territorial division here almost surely resulted in fewer sales to retailers—hence fewer purchases from out-of-state distillers—than would have occurred had free competition prevailed among the wholesalers.* In addition the wholesalers' division of brands meant fewer wholesale outlets available to any one out-of-state distiller. Thus the state-wide wholesalers' market division inevitably affected interstate commerce. (emphasis supplied) 389 U.S. at 321–322, 88 S.Ct. at 444.

More recently in the case of *Hospital Bldg. Co. v. Rex Hospital Trustees, supra,* the Supreme Court in relying on *Burke* once again emphasized that division of markets artificially represses the customer's free choice and almost surely results in fewer purchases of materials than had free competition prevailed.

■ We conclude from the teachings of the *Burke* and *Hospital* cases that the Government proved a substantial adverse affect on interstate commerce.

First, assuming that open competition had been present, the free choice of the renters of industrial garments to obtain garments from out-of-state suppliers other than those to which their choice was artificially limited would have prevailed. Secondly, as the Supreme Court has held, the renter's freedom to deal with the company of its choice and on the most advantageous terms it could find would have resulted in more garment rentals by the customers of garments supplied from outside the State of Florida.

Thus, we hold that the requisite restraint on interstate commerce was proven to have existed under both the "flow" and the "affect" tests.

### III. *Was Cadillac a Participant in the Conspiracy?*

We turn now to address Cadillac's contention that as a matter of law it was not shown to have participated in the customer allocation conspiracy.

It is not seriously contended that a conspiracy among certain industrial garment companies did not exist. On the contrary, it is clear beyond any doubt that such a conspiracy existed. Agents of companies such as Mechanics, Neway, UFI and Superior freely and unequivocally testified that they had agreed not to solicit each other's accounts and had engaged in periodic account balancing. Records were introduced into evidence which bore notations to that effect.

■ The only question becomes one of Cadillac's participation. Once the existence of the conspiracy has been proved, as it clearly was, only "slight evidence" must be found to connect the defendant to that conspiracy. *United States v. Evans,* No. 76–3715 (5th Cir. 1978) and cases cited therein. In this case, we find that ample evidence existed to support the finding that Cadillac was a participant.

■ Robert Davidoff, a sales manager of Superior, testified that he had engaged in frequent conversations with Cadillac managers, Carmine Yannotta and Burt Kanarek over dissatisfied Cadillac customers who wished to switch suppliers. The purpose of the conversations were to alert Cadillac so that Cadillac could try to retain the accounts. Through other conversations, Davidoff testified that he and Kanarek and Yannotta reached agreements over the balancing of accounts. Records kept by Davidoff confirmed the existence of these agreements.

Mr. Abraham Sherman, now the manager of Cadillac, was formerly the manager of Mechanics. While he denied that he engaged in account balancing with Mr. Kanarek, he did admit that while manager for Mechanics, he had agreed with Kanarek not to solicit each other's existing customers.

Seymore Rosenblatt, a former driver for Mechanics, testified that he remembered a particular dissatisfied Mechanics customer who had told him that he was going to switch to Cadillac. Rosenblatt paid a visit to the store owner. Rosenblatt testified as follows:

A. The owner told me that Cadillac was willing to write up the business and he was unhappy with the condition of our garments, they were getting old and shabby and Cadillac was going to give him new uniforms and he was going to change over to Cadillac Uniform. This came from the owner.

Q. What did you tell him?

A. Well, I said that if this is the whole question of the matter, what if we were to replace your garments for you?

So, he said, well, if we would do that he would be willing to stay with us, but he had been telling the driver and nothing had been done about it, but after talking to him we told him that I would get him new garments and he agreed to stay with us, so I went back to the company and I called up Howard Young [a Cadillac manager] and told him at that time that if he would stay away from the shop that I would be able to save the stop.

He said he would see that nobody from Cadillac went back there.

Mr. Brown, the sales manager of Neway, testified that he had agreed with Mr. Yannotta to engage in the nonsolicitation arrangement. Mr. Sherman also testified that while at Mechanics, he and Mr. Kanarek negotiated an exchange of customers in Monroe County, Florida.

There is additional evidence in the record that supports the conclusion that Cadillac was indeed a participant in the conspiracy. Yet, in light of the evidence recited above, we need not look any further. The trial judge, heard the evidence, assessed the credibility of all the witnesses, and found that Cadillac was a participant in the conspiracy. There was much more than the necessary "slight evidence," to support the finding of the trial court. Cadillac's enumeration is meritless.

IV. *Rule of Reason or Per Se Analysis.*

■ We turn now to examine Cadillac's contention that the District Court erred in holding that the customer allocation arrangement constituted a *per se* violation of the Sherman Act.

Cadillac urges that the District Court should have applied the "rule of reason" analysis in determining whether or not the actions of Cadillac violated Section 1. Cadillac argues that its conduct was justified as a reasonable restraint of trade. The nonsolicitation of each other's customers was simply a method of assuring non-interference with the service contracts existing between the customer and the other particular company. Cadillac points out that the customers were originally acquired through

free and open competition and that it makes a substantial capital investment in purchasing garments to supply each new customer. Cadillac asserts that free and open competition would result in the raiding of accounts which would result in the loss of this capital investment. To litigate against the customer breaching a service contract or against the raiding competitors, Cadillac contends, is too expensive a course of action. The "balancing of accounts" was simply a method of keeping records "to make sure that one competitor was not tortiously interfering or raiding one's accounts to the point where retaliatory raiding or court action was in order to protect or rectify violations of their proprietory rights."

While Cadillac's argument at first blush seems to possess some merit, upon close analysis we reject it.

In *Northern Pacific R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), Justice Black in a much quoted passage explained the rationale for the use of *per se* analysis:

[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principal of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

In this case, it is easily observed that the restraint under scrutiny is a purely horizontal market division.

If the restraint were a *territorial* horizontal market division, there would be no question that the *per se* rule would apply. *See e. g., United States v. Topco Associates, supra; United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1966) and cases cited therein. The defendant has stressed that the restraint in this case, while of a horizontal nature, is not a territorial one. We agree with defendant yet we also agree with the view of the Second Circuit that this is a distinction without substance.

In the case of *United States v. Consolidated Laundries Corporation, supra,* our sister circuit addressed this issue and squarely held that the allocation of customers is a *per se* violation of Section One.

. . . We fail to see any significant difference between an allocation of customers and an allocation of territory. *See United States v. American Linen Supply Co.,* D.C.N.D.Ill., 141 F.Supp. 105, 115. Suppose for illustration, that appellants had allocated the Bronx to Consolidated, Brooklyn to General, and Queens to Modern Silver, reserving the right to compete with each other in Manhattan. Clearly this hypothetical division of markets would be unreasonable *per se,* notwithstanding the open competition in Manhattan. Similarly their agreement to suppress all competition as to one phase of their business, i. e., old customers, should be *per se,* illegal irrespective of their competition for new customers. And when, as here, the allocation is coupled with predatory practices against independent linen suppliers in order to compel them to join the conspiracy or be put out of business, there is even more reason not to permit the conspirators to justify their activities on the ground that business expediency makes them reasonable.

291 F.2d at 574–575.

Of course it should be noted that in the instant case the Government neither sought to nor proved that the allocation scheme was coupled with predatory practices such as price-fixing. In recent years, the Supreme Court has held that such an addition-

al showing is not required when a horizontal market division has been shown to exist. *United States v. Topco Associates, supra.*

In addition to the Consolidated Laundries case, more recent authorities from the Supreme Court and this Court support the view we take.

In *United States v. Topco Associates, supra,* the Supreme Court reaffirmed its position that horizontal market divisions are *per se* violations, in stating: "We think that it is clear that the restraint in this case is a horizontal one, and, therefore, a *per se* violation of § 1." 405 U.S. at 608, 92 S.Ct. at 1134.

In addition to condemning the restraints on the retailing of goods, the Court in *Topco* addressed restrictions on the wholesaling of food products. A strong argument can be made that the Court expressly condemned customer allocation as a *per se* violation of Section One.

The Court characterized the wholesaling restrictions as follows:

The Government also makes a subsidiary challenge to Topco's practices regarding licensing members to sell at wholesale. Under the bylaws, members are not permitted to sell any products supplied by the association at wholesale, whether trade-marked or not, without first applying for and receiving special permission from the association to do so. Before permission is granted, other licensees (usually retailers), whose interests may potentially be affected by wholesale operations, are consulted as to their wishes in the matter. If permission is obtained, the member must agree to restrict the sale of Topco products to a specific geographic area and to sell under any conditions imposed by the association. Permission to wholesale has often been sought by members, only to be denied by the association. *The Government contends that this amounts not only to a territorial restriction violative of the Sherman Act, but also to restriction on customers that in itself is violative of the Act.* (emphasis supplied) 405 U.S. at 603–604, 92 S.Ct. at 1131.

The Supreme Court held that,

[J]ust as the territorial restrictions on retailing Topco-brand products must fall, so must the territorial restrictions on wholesaling. The considerations are the same, and the Sherman Act requires identical results.

*We also strike down Topco's other restrictions on the right of its members to wholesale goods. These restrictions amount to regulation of the customers to whom members of Topco may sell Topco-brand goods.* (emphasis supplied) 405 U.S. at 612, 92 S.Ct. at 1135.

In our Circuit we have recently held that the allocation of customers is *per se* illegal. In *United States v. Flom, supra* this Court examined a customer allocation conspiracy with its attendant price fixing, effectuated by submission of rigged bids on construction contracts. We observed that this market division hampered the free choice of the consumer of the parties with whom the consumer would transact business, and provided no incentive to achieve maximum efficiency on a industry wide basis. The court held in part that "[a]n agreement to 'fix prices, *allocate customers,* rig bids, and coerce [others] to join the conspiracy' violated the Act, *United States v. Pennsylvania Refuse Removal Association,* 357 F.2d 806 (3rd Cir.), *cert. denied* 384 U.S. 961, 86 S.Ct. 1588, 16 L.Ed.2d 674 (1966)." (emphasis in the original). 558 F.2d at 1183.

Indeed, the arguments preferred by Cadillac in defense of its conduct have been previously rejected. In response to the argument that fierce competition would damage the defendant's business, the Court in Topco stated:

Without territorial restrictions, Topco members may indeed '[cut] each other's throat.' (cite omitted). But we have never found this possibility sufficient to warrant condoning horizontal restraints of trade.

405 U.S. at 611, 92 S.Ct. at 1135.

The Court also refused to look to the good intentions of the defendant when applying the *per se* rules.

In applying these rigid rules, the Court has consistently rejected the notion that naked restraints of trade are to be tolerated because they are allegedly developed to increase competition.

405 U.S. at 610, 92 S.Ct. at 1134.

Indeed in another case, *Copper Liquor Inc. v. Adolph Coors Co.,* 506 F.2d 934 (5th Cir. 1975), this Court rejected, in the context of vertical territorial restraints, the argument that absent the restraint the capital investment of a defendant would be impaired. Our Court answered this argument by stating:

> Just as obvious is the response that activities regarded most worthy of promotion by a society will offer prospective rates of return sufficient to attract the additional capital necessary, that risk is inherent in all capital investment to one degree or another, and that the most efficient allocation of capital resources may be achieved by eliminating restrictions that serve to isolate artificially a particular industry from competition.

506 F.2d at 941–943 n.5.

We might also add that while the defendant has stressed that the protection of existing service contracts between customer and supplier is the reason for the nonsolicitation of customers of other companies, the record contains ample evidence to support a finding that the existence of service contracts did not become widespread until the investigation of the anticompetitive conduct in the South Florida market began.

Additional authorities lend support to the view we take yet we need not address them. We hold that the allocation of customers is a *per se* violation of Section One of the Sherman Act.

V. *Corporate Responsibility.*

 In its fifth enumeration, Cadillac argues that it was error to impute the acts of the corporate agents to the corporation. Cadillac argues that the acts of its Florida managers in joining the non-solicitation and account balancing arrangement were in direct opposition to instructions given by the president of the corporation and outside the scope of their authority.

Prior to trial, Government counsel and Cadillac's trial counsel entered into a stipulation which stated that the Florida managers were given "direct responsibility for all of Cadillac Overall Supply Company's sales and operations in South Florida." The record as well amply supports the conclusion that the Florida managers had authority to accept or reject customers, to solicit or not solicit customers, and to exchange or not to exchange accounts.

While the evidence established that Mr. Shulevitz, the president of Cadillac, instructed Mr. Sherman, upon his retention in 1973 as Cadillac's Florida manager, to compete openly in all phases of the garment operation and not to engage in "holding hands" with competitors, we think the holding of the Ninth Circuit in *United States v. Hilton Hotels Corporation,* 467 F.2d 1000, (9th Cir.) *cert. denied* 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973) is sound.

In *Hilton Hotels,* the Court held that "as a general rule a corporation is liable under the Sherman Act for the acts of its agents in the scope of their employment, even though contrary to general corporate policy and expressed instructions to the agents." 467 F.2d at 1007.

We think for the reasons stated by the Court in *Hilton Hotels,* that application of this rule to Cadillac is consistent with the policies underlying the Sherman Act.

While it may be that the anticompetitive conduct in this case did not in fact bring monetary gain to Cadillac, this fact does not militate against our conclusion that the actions of the Florida agents were taken for the purpose of benefiting the corporation.

VI. *Remaining Enumerations of Error.*

 Finally, we have considered Cadillac's contention that the records maintained by defendants' co-conspirators were improperly admitted into evidence and find this contention to be lacking in merit. They were properly admissible.

 Likewise, we reject Cadillac's contention that the prosecutor's witness inter-

view summaries were "statements adopted or approved of by him as contemplated by 18 U.S.C. § 3500 (commonly known as the Jencks Act). *Goldberg v. United States,* 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976); *Palermo v. United States,* 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); *United States v. Crumpler,* 536 F.2d 1063 (5th Cir. 1976); *Matthews v. United States,* 407 F.2d 1371 (5th Cir. 1969).

Therefore, it follows that the judgment of the District Court must be and hereby is

AFFIRMED.