[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 11, 2000
THOMAS K. KAHN
CLERK

No. 99-13065

D. C. Docket No. 97-06012-CR-WDF

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

CHRISTOPHER PLUMMER,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Florida

**(August 11, 2000)**

Before TJOFLAT, MARCUS, and CUDAHY[*], Circuit Judges.

MARCUS, Circuit Judge:

---

[*]Honorable Richard D. Cudahy, U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

This appeal arises out of the district court's dismissal of a two-count indictment against Defendant Christopher Plummer, a United States and Bahamian citizen whose boat allegedly was in possession of over $50,000 dollars worth of Cuban cigars when it was halted off the Florida coast. Plummer was charged in Count I with attempting to smuggle the cigars into the United States in violation of 18 U.S.C. § 545 and in Count II with unauthorized transportation outside of the United States of merchandise manufactured in Cuba in violation of the Trading With the Enemy Act, 50 U.S.C. Appendix §§ 5(b) and 16 ("TWEA"). The district court dismissed both counts, holding that Defendant was not inside United States territorial waters when seized and thus could not be guilty of attempted smuggling, and that the carrying of Cuban cigars abroad could not lawfully trigger the applicability of the TWEA. Because the fact that Plummer's wrongful acts occurred outside U.S. territory does not as a matter of law prevent his prosecution under these statutes, we reverse the order of dismissal.

I.

On February 5, 1997, a federal grand jury in the Southern District of Florida returned a two-count indictment against Plummer. The allegations are straightforward. Count I alleges that on or about August 4, 1996, Plummer "willfully and knowingly and with intent to defraud the United States" attempted

2

to "smuggle and clandestinely introduce into the United States" approximately 121 boxes of cigars manufactured in Cuba with a value of greater than $50,000, in violation of 18 U.S.C. §§ 545 and 3238 (a venue statute). Count II alleges that Plummer -- "a person subject to the jurisdiction of the United States" -- knowingly and willfully "transport[ed] outside of the United States merchandise made and derived in whole or in part of any article which is the growth, produce, or manufacture of Cuba, without such transaction having been authorized by the Secretary of Treasury" in violation of 50 U.S.C. Appendix §§ 5(b) and 16 and implementing regulations. The indictment does not allege that the unlawful conduct occurred in United States territory. Rather, it alleges only that Plummer was "brought to the Southern District of Florida."

On April 8, 1997, Plummer moved to dismiss the indictment. The motion was assigned to a magistrate judge, who issued a report and recommendation recommending that the motion be denied.[1] Plummer filed objections. On July 31, 1999, the district court overruled the magistrate judge's recommendation, granted the motion, and dismissed the indictment. The court later issued a corrected dismissal order on August 12, 1999.

---

[1]The magistrate judge's report was highly detailed, and recommended that the motion be denied for essentially the same reasons we set forth in this opinion.

3

The district court began its opinion by reciting facts beyond those alleged in the indictment which had been proffered at various pre-trial hearings. With respect to Count I, the court, citing "indirect authority from drug cases," found that "to constitute attempted smuggling under section 545 there must be, at a minimum, an allegation that the defendant willfully brought the prohibited merchandise into waters of the United States." Dist. Ct. Op. at 4. Relying on the facts set out at the start of its opinion, the court then ruled that "when [Plummer's] vessel was intercepted on the high seas with exposed boxes of Cuban cigars, still some 40 miles from waters of the United States, and he was forcibly brought into this country, [Plummer] had not taken the crime of smuggling merchandise into the United States to the brink of completion." Id. at 5. With respect to Count II, the district court offered multiple reasons for dismissal (only a few of which are argued by Plummer on appeal). The district court found that the regulations applying 50 U.S.C. Appendix §§ 5(b) and 16 to Cuba were invalid as "exceeding delegated powers" to the extent they purported to apply these statutes extraterritorially. Id. at 9. The court also found that "it is not alleged that any enemy country or enemy national has an interest in the cigars as would be required to invoke section 5(b)(1)(B)." Id. The court found as well that "the indictment does not allege in Count II that the defendant willfully and knowingly sent or

4

brought Cuban cigars into the United States." Id.  Finally, the court determined that "[w]hen confronted in international waters the defendant was not a person subject to the jurisdiction of the United States." Id.  The district court ultimately found "convincing" Plummer's contention that "if [Plummer] could be found in violation of [the TWEA] on the facts of this case then a United States citizen who purchases or smokes a Cuban cigar anywhere in the world could be found guilty of violating the regulations," contrary to the intent of Congress. Id.  The Government timely appealed the district court's order.

## II.

We turn first to the district court's dismissal of Count I.[2]  The Government argues that the indictment alleges all that is necessary to state the offense of attempted smuggling in violation of 18 U.S.C. § 545.  The Government also contends that even though the indictment does not allege that Plummer's unlawful acts occurred in United States territory, the statute applies extraterritorially. Plummer responds that Count I fails to allege an "attempt" because acts committed entirely outside U.S. territory cannot, as a matter of law, constitute a "substantial

---

[2]The parties correctly agree that this appeal raises issues of statutory interpretation that must be reviewed de novo. See, e.g., United States v. Hooshmand, 931 F.2d 725, 737 (11th Cir. 1991).

5

step" toward completion of the offense of smuggling. Plummer also maintains that section 545's attempt provision cannot be applied extraterritorially.

Title 18 U.S.C. § 545 provides in pertinent part that "[w]hoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced" shall be guilty of an offense. The prohibition against "attempts to smuggle" was added to the statute by the Violent Crime Control and Law Enforcement Act of 1994 in order to "eliminate inconsistencies and gaps in coverage." See H.R. Conf. Rep. No. 711, reprinted at 1994 U.S.C.C.A.N. 1839 (1994). To date, no published decision has addressed the scope or extraterritorial effect of section 545's attempt provision.

As an initial matter, we have no difficulty concluding that Count I adequately states a violation of that provision. In reviewing a motion to dismiss an indictment we look only at whether the Government has alleged each of the elements of the statute. See, e.g., United States v. Fitapelli, 786 F.2d 1461, 1463 (11th Cir. 1986) ("In judging the sufficiency of the indictment, the court must look to the allegations and, taking the allegations to be true, determine whether a criminal offense has been stated."); United States v. Cadillac Overall Supply Co., 568 F.2d 1078, 1982 (5th Cir. 1978) ("[W]e must view the [indictment] . . . to

6

determine whether it sets forth the elements of the offense charged . . . . In this Circuit, we have held that, ordinarily, the pleading of the allegations in terms of the statute is sufficient . . . ."); see also Fed. R. Crim. P. 7(c)(1) (indictment should be a "plain, concise and definite written statement of the essential facts constituting the offense charged"). Here, the Government has expressly alleged that Plummer "willfully and knowingly and with intent to defraud the United States" attempted to "smuggle and clandestinely introduce into the United States" approximately 121 boxes of cigars manufactured in Cuba in violation of section 545. The district court's finding that the Government alleged only an "intent to smuggle" overlooks the plain language of the indictment.[3]

Moreover, we reject the argument that, as a matter of law, the offense of attempted smuggling can never be predicated on acts occurring exclusively outside U.S. territory because the underlying offense of smuggling can only be completed on U.S. territory. A conviction for criminal attempt generally requires proof that

---

[3]The district court's conclusion appears to have been based at least in part on its view of facts not alleged in the indictment. At this stage, however, the focus is the indictment itself; and while both parties discussed the underlying facts at pre-trial hearings and in their written submissions, the parties also advised the district court that in ruling on the motion it was limited to the contents of the indictment. During oral argument before this Court Plummer maintained that we nevertheless could consider the undisputed fact that the boat was stopped in international waters some 40 miles from the U.S. mainland. We find it unnecessary to do so, because the fact that Plummer was 40 miles off the U.S. mainland (as opposed to simply being an unspecified distance outside U.S. territory) does not alter our analysis of whether this indictment states an offense.

7

the defendant (1) was acting with state of mind required for commission of the crime; and (2) was engaged in conduct that constitutes a substantial step toward commission of the crime. See United States v. Carothers, 121 F.3d 659, 661 (11th Cir. 1997) (citing United States v. Mandujano, 499 F.2d 370, 376 (5th Cir. 1974)). This inquiry is by definition highly fact-specific. We see no reason why facts could not be developed at trial to establish that a defendant such as Plummer had formed the requisite intent and had taken a substantial step toward the completed offense of smuggling even though he was outside U.S. territory at the time he was apprehended.

The bright-line rule adopted by the district court has no foundation in the law of attempt or the language of section 545. While Plummer fairly asserts that the defendant's proximity to the intended location of a crime may be one consideration in determining whether his conduct represents a substantial step toward completion of the crime, it is certainly not the sole consideration, and in any case only has meaning when other factors (such as the nature of the intended offense, the type of transportation available, and the course of the vessel, just to name a few) are also taken into account. Whether Plummer's conduct advanced far enough to constitute an attempt is an issue for factual development and trial, not one for this Court to resolve as a matter of law based solely on the indictment.

8

Plummer's citations to <u>Keck v. United States</u>, 172 U.S. 434, 19 S. Ct. 254, 43 L. Ed. 505 (1899) and <u>United States v. Lespier</u>, 601 F.2d 22 (1st Cir. 1979) do not change this result. In <u>Keck</u>, the Supreme Court held with respect to the predecessor statute to section 545 that the crime of smuggling was not complete until the illegal goods landed on shore. 172 U.S. at 444-45, 19 S. Ct. at 257 ("mere acts of concealment of merchandise on entering the waters of the United States, however preparatory they may be and however cogently they may indicate an intention of thereafter smuggling or clandestinely introducing, at best are but steps or attempts not alone in themselves constituting smuggling"). In <u>Lespier</u>, the First Circuit, with a "sense of frustration," applied the holding in <u>Keck</u> to reverse a smuggling conviction where the illegal goods had not yet been brought on shore at the time the boat was seized in U.S. territorial waters. 601 F.2d at 28.

As Plummer concedes, neither <u>Keck</u> nor <u>Lespier</u> interpreted the new attempt provision of section 545. <u>See</u> <u>Keck</u>, 172 U.S. at 444, 19 S. Ct. at 257 (stressing that the prior version of the statute "d[id] not include mere attempts"). Indeed, Plummer acknowledges that the facts of <u>Keck</u> would constitute the crime of attempt under the current version of the statute. Nothing in either opinion supports the notion that Plummer's alleged acts in this case cannot constitute attempted smuggling. In particular, neither opinion holds that as a matter of law the acts

9

allegedly constituting the "substantial step" toward smuggling cannot occur outside U.S. territory.  Cf. United States v. Ritterman, 273 U.S. 261, 268, 47 S. Ct. 371, 372, 71 L. Ed. 636 (1927) (Keck "did not decide that a man who wishes to smuggle must wait until he can find a customs house").  Simply put, we find no basis to dismiss Count I by adopting a bright-line rule that acts outside the United States can never constitute attempted smuggling in violation of section 545.

We also reject Plummer's related argument that section 545's attempt provision cannot be applied extraterritorially. Congress unquestionably has the authority to enforce its laws beyond the territorial boundaries of the United States. See, e.g., Foley Bros., Inc. v. Filardo, 336 U.S. 281, 284-285, 69 S. Ct. 575, 577, 93 L. Ed. 680 (1949).  Federal criminal statutes may properly include extraterritorial effects.  See United States v. Baker, 609 F.2d 134, 136 (5th Cir.), reh'g denied, 613 F.2d 314 (1980).  Whether Congress has in fact exercised that authority in this particular instance is a matter of statutory construction.  It is our task to determine whether Congress intended the attempt provision of 18 U.S.C. § 545 to apply to United States citizens engaged in conduct outside of the United States.

In <u>United States v. Bowman</u>, 260 U.S. 94, 43 S. Ct. 33, 67 L. Ed. 149

(1922), the Supreme Court adopted the following framework for analyzing the

extraterritorial effect of federal criminal statutes such as section 545:

> The necessary locus [of the crime], when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds, which affect the peace and good order of the community must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it.  If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard.  <u>But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents.</u>  Some such offenses can only be committed within the territorial jurisdiction of the government because of the local acts required to constitute them.  Others are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home.  <u>In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.</u>

<u>Id.</u> at 97-98, 43 S. Ct. at 41 (emphasis added).  Thus, as this Court explained in

<u>United States v. MacAllister</u>, 160 F.3d 1304, 1307-08 (11th Cir. 1998), <u>reh'g and</u>

11

reh'g en banc denied, 176 F.3d 494 (11th Cir.), cert. denied, 120 S. Ct. 318 (1999): "Bowman established the rule that Congress need not expressly provide for extraterritorial application of a criminal statute if the nature of the offense is such that it may be inferred."[4]  On authority of Bowman, courts in this Circuit and elsewhere have routinely inferred congressional intent to provide for extraterritorial jurisdiction over foreign offenses that cause domestic harm.  See, e.g., MacAllister (discussed infra); United States v. Benitez, 741 F.2d 1312, 1316-17 (11th Cir. 1984) (conspiracy to murder government agents and assault of government agents abroad); United States v. Perez-Herrera, 610 F.2d 289, 290 (5th Cir. 1980) (attempt to import marijuana into the United States); Baker, 609 F.2d at 137-39 (possession with intent to distribute and conspiracy to import marijuana); see also United States v. Vasquez-Velasco, 15 F.3d 833, 839 n. 4 (9th Cir. 1994)

---

[4]Plummer proposes that the Supreme Court's decision in E.E.O.C. v. Arabian American Oil Company, 499 U.S. 244, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991) overruled Bowman and requires a clear Congressional statement of intent to apply a criminal statute extraterritorially.  We rejected this argument in MacAllister and thus are bound to adhere to that decision.  See United States v. Steele, 147 F.3d 1316, 1317-18 (11th Cir. 1998) (en banc).  As we observed in MacAllister, Arabian American was a civil case, and did not even refer to Bowman let alone purport to overrule it.  We are not aware of any court to this day that has relied on Arabian American to hold Bowman inapplicable to a criminal statute such as the one at issue here, and the two cases that Plummer says "question" Bowman in light of Arabian American do not question its applicability to this kind of statute.  United States v. Dawn, 129 F.3d 878, 882 n.7 (7th Cir. 1997) ("Bowman recognizes an exception to the presumption against extraterritorial intent for 'criminal statutes . . .'"); Kollias v. D & G Marine Maint., 29 F.3d 67, 71 (2d Cir. 1994) (after Arabian American, Bowman applies to "only criminal statutes and perhaps only those relating to the government's power to prosecute wrongs committed against it").

12

(murder abroad to further a drug-trafficking enterprise); United States v. Harvey, 2 F.3d 1318, 1329 (3d Cir. 1993) (possession of child pornography made abroad); United States v. Felix-Gutierrez, 940 F.2d 1200, 1204 (9th Cir. 1991) (accessory after-the-fact to kidnaping and murder of government agent abroad); Chua Han Mow v. United States, 730 F.2d 1308, 1311 (9th Cir. 1984) (conspiracy to import drugs into the United States).

Relying on Bowman, the Ninth Circuit in Brulay v. United States, 383 F.2d 345 (9th Cir.), cert. denied, 389 U.S. 986, 88 S. Ct. 469, 19 L. Ed. 2d 478 (1967) determined that Congress intended the pre-1994 version of section 545 to apply extraterritorially. That case involved a conspiracy to smuggle amphetamine tablets into the United States in violation of section 545 and the general conspiracy statute, 18 U.S.C. § 371. The court found that even though the alleged conspiracy had not been formed in the United States, the defendant's overt acts occurred outside the United States, and the defendant was arrested outside the United States, the statute still could be applied to his conduct. The court reasoned: "Since smuggling by its very nature involves foreign countries, and since the accomplishment of the crime always requires some action in a foreign country, we have no difficulty inferring that Congress did intend that the provisions of 18 U.S.C. § 545 should extend to foreign countries at least as to citizens of the United

13

States . . . ." 383 F.2d at 350. Although this Court has not had occasion to adopt Brulay, we did endorse that decision in MacAllister, where we ruled that even in the absence of a clear Congressional statement of intent 18 U.S.C. § 963 could be applied extraterritorially to reach a conspiracy to export cocaine from Canada to the United States. We explained that "'[b]y its very nature [drug smuggling] involves foreign countries, and . . . the accomplishment of the crime always requires some action in a foreign country . . . .'" 160 F.3d at 1308 (quoting Brulay).

We agree with this reasoning and find that Congress's intent to apply section 545's attempt provision extraterritorially may be inferred from the nature of the offense and the problem at which the statute is directed. Although the completed crime of smuggling does require some conduct within U.S. territory, smuggling is quintessentially an international crime, and the acts constituting an attempt to smuggle are not "logically dependent on their locality." Bowman, 260 U.S. at 98, 43 S. Ct. at 41. On the contrary, those acts are as likely, if not more likely, to occur beyond U.S. territory as they are to occur within U.S. territory. Smuggling itself necessarily involves activities outside U.S. territory, and the accomplishment of the crime always requires some action in foreign countries or international waters. Indeed, in order to smuggle goods into the United States, the goods must

14

be located outside the United States. There is no reason to believe that Congress would have intended to criminalize the "on shore" acts constituting an attempt to smuggle while leaving unchecked the same kinds of acts occurring elsewhere, especially when the acts are perpetrated by a United States citizen. Congress's addition of an attempt clause to section 545 in order to "eliminate . . . gaps in coverage" also strongly suggests its intent not to limit the territorial reach of the statute.

Plummer makes essentially two arguments against applying section 545's attempt provision extraterritorially. First, he argues that attempted smuggling falls into the first category of crimes discussed in <u>Bowman</u> (those "logically dependent on their locality"). As explained above, however, the crime of attempted smuggling, unlike the completed crime of smuggling, does not by definition require conduct on U.S. territory. A defendant may just as readily form the requisite intent, and take a substantial step toward bringing the prohibited goods to shore, from outside U.S. territory as inside. Section 545's attempt provision is the type of law that falls into <u>Bowman</u>'s second category, such that "to limit [its] locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home." <u>Id.</u>

15

Second, Plummer argues that cases like Brulay and MacAllister are inapposite because they involve conspiracies rather than attempts. We find this distinction unpersuasive. Attempt, like conspiracy, is an inchoate crime that can be committed regardless of whether the object of the venture is achieved. See, e.g., United States v. Rey, 641 F.2d 222, 224 n.6 (5th Cir.) ("When the underlying offense is an inchoate one such as attempt or conspiracy, then the attempt or conspiracy is all that must be shown to establish the underlying offense, and it is not necessary to show the completion of the objective of that inchoate crime."), reh'g denied, 646 F.2d 566 (1981). Accordingly, territorial limitations on the location of acts required to complete the offense do not necessarily limit where the acts merely constituting an attempt or conspiracy might occur.

In an analogous case, this Court in binding precedent found that an attempt provision in a federal smuggling statute had extraterritorial application. In Perez-Herrera, we addressed 21 U.S.C. § 963 in connection with an alleged attempt to import narcotics into the United States. The defendants argued that they committed no crime because the indictment did not allege that any part of the attempt was made in the United States (defendants were apprehended at sea 70 miles from U.S. territory). We rejected their argument, observing that where the effect of limiting a criminal statute "to acts entirely within the United States

16

'would be greatly to curtail the scope and usefulness of the statute,' congressional intent to legislate extraterritorially will be inferred." 610 F.2d at 290 (quoting Bowman, 260 U.S. at 98, 43 S. Ct. at 41). As we explained, "[l]imiting the application of section 963 to attempts committed at least partially in the United States would not eliminate all prosecutions, but, by setting up a free-zone just beyond our territorial waters where smugglers could safely await opportunities to move drugs to the mainland, such a construction would substantially impair enforcement activities." Id. at 292. We also explained that an attempt to import narcotics, just like the completed crime, has "real and significant effects within this country" because "even an attempt to violate the law injures the state" and burdens domestic law enforcement agencies. Id. The same concerns justify inferring a congressional intent to apply section 545 extraterritorially.[5]

Finally, we see no international law difficulty in applying section 545 extraterritorially in this case. See Rivard v. United States, 375 F.2d 882, 885 (5th

[5]Plummer argues that Perez-Herrera (and other cases involving drug smuggling) is distinguishable because that opinion rests on the assumption that illegal narcotics are "commodities outlawed by all nations and considered a fit subject for commerce by none," 610 F.2d at 292, and therefore Congress has greater latitude to regulate extraterritorial conduct. But the former Fifth Circuit's opinion did not turn solely or even primarily on that assumption; it rested in equal measure on the same kinds of "practical considerations related to the operation of the statute," id. at 291, that are present here. Moreover, the former Fifth Circuit's remark was simply made to distinguish Cunard S.S. Co. v. Mellon, 262 U.S. 100, 43 S. Ct. 504, 67 L. Ed. 894 (1923), a case where the Supreme Court determined that certain Prohibition-related statutes were expressly limited to conduct within U.S. territory. Section 545, significantly, has no such express limitation.

17

Cir. 1967) (noting that the exercise of extraterritorial jurisdiction should comport with international law). In <u>Rivard</u>, we explained that the law of nations permits the exercise of criminal jurisdiction under five general principles. <u>Id.</u> at 885-86. The Government asserts that jurisdiction here is proper under the "territorial" principle, which permits jurisdiction over acts elsewhere that have effects within the United States. <u>Id.</u> at 886-87. Plummer contends that this principle does not support jurisdiction in this case, because he did not complete the crime of smuggling and therefore his acts in international waters did not have effects in the United States. But as <u>Perez-Herrera</u> suggests, even an attempt to smuggle prohibited merchandise into the United States has effects in this country. In any event, we find that jurisdiction exists under the "nationality" principle, which permits a state to exercise criminal jurisdiction over one of its nationals. <u>Id.</u> at 885 & 886 n.6. Plummer is concededly a United States citizen, and therefore exercising jurisdiction over him in this case is proper. <u>See</u> <u>United States v. Columba-Colella</u>, 604 F.2d 356, 358 (5th Cir. 1979) ("a country may supervise and regulate the acts of its citizens both within and without its territory"); <u>see also</u> <u>Harvey</u>, 2 F.3d at 1329; <u>United States v. King</u>, 552 F.2d 833, 851 (9th Cir. 1976). Accordingly, we conclude that Count I of the indictment states the offense of attempted smuggling in violation of 18 U.S.C. § 545. We therefore reverse the dismissal of Count I.

18

III.

We reach the same conclusion with respect to Count II, which alleges a violation of sections 5(b) and 16 of the Trading with the Enemy Act. Section 5(b) of the TWEA authorizes the President, through a designated agency, to "investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. App. § 5(b)(1)(B). Section 16, in turn, criminalizes a violation of any "order of the President issued in compliance with the provisions of the Act." 50 U.S.C. App. § 16.

The relevant regulations are part of the Cuban Asset Control Regulations ("CACRs"), which were implemented in 1963 under Section 5(b) of the TWEA in response to alleged Cuban efforts to destabilize Latin American governments. See Regan v. Wald, 468 U.S. 222, 226, 104 S. Ct. 3026, 3030, 82 L. Ed. 2d 171 (1984) (citing Presidential Proclamation No. 3447, 3 C.F.R. § 157 (1959-1963 Comp.)). They provide that "[e]xcept as specifically authorized by the Secretary of the

Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, no person subject to the jurisdiction of the United States may purchase, transport, import, or otherwise deal in or engage in any transaction with respect to any merchandise outside the United States if such merchandise: (1) is of Cuban origin; or (2) is or has been located in or transported from or through Cuba; or (3) is made or derived in whole or in part of any article which is the growth, produce or manufacture of Cuba." 31 C.F.R. § 515.204. The regulations define the statutory term "person subject to the jurisdiction of the United States" as including "[a]ny individual, wherever located, who is a citizen or resident of the United States." 31 C.F.R. § 515.329.[6]

---

[6]The TWEA was first passed in 1917, six months after the United States entered World War I. See Act of Oct. 6, 1917, ch. 106, 40 Stat. 411. As originally enacted, the TWEA dealt only with the President's use of economic powers in times of war, but was expanded in 1933 to deal with peacetime national emergencies. Act of Mar. 9, 1933, ch. 1, 48 Stat. 1. The President delegated his authority under the TWEA to the Secretary of the Treasury, Exec. Order No. 9193, 3 C.F.R. 1174, 1175 (1942), who in turn delegated that authority to the Office of Foreign Assets Control, Treasury Department Order No. 128 (Rev. 1, Oct. 15, 1962). Section 5(b) of the TWEA was amended in 1977 to limit the President's authority once again to times of war. See Pub. L. No. 95-223, § 101, 91 Stat. 1625; the same bill enacted a new law that now covers the President's powers in response to peacetime crises. See International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06 ("IEEPA"). Significantly, however, the IEEPA grandfathered the existing exercises of the President's "national emergency" authority, see Pub. L. 95-223, § 101(b), 91 Stat. 1625, and permitted the President to extend their exercise at one-year intervals provided that such an extension "is in the national interest." Pub. L. 95-223, § 101(c), 91 Stat. 1625. The recently enacted Cuban Liberty and Democratic Solidarity Act of 1996, codified at 22 U.S.C. §§ 6021-24, 6031-46, 6061-67, 6081-85 & 6091, prescribes certain conditions that must occur in Cuba before the President may lift the embargo, including the transition to a democratically elected government, and requires the President to consult with Congress before lifting it. See 22 U.S.C. §§ 6061, 6064-6066. This Act continues the embargo indefinitely and effectively suspends the IEEPA's requirement that the President revisit the embargo each year. See 22 U.S.C. § 6032(h) (providing that all restrictions

20

Count II expressly alleges the elements of a violation of these provisions. It asserts that Plummer -- "a person subject to the jurisdiction of the United States" -- knowingly and willfully "transport[ed] outside of the United States merchandise made and derived in whole or in part of any article which is the growth, produce, or manufacture of Cuba, without such transaction having been authorized by the Secretary of Treasury." Nothing more need be alleged to withstand a motion to dismiss.

Plummer makes two arguments for dismissal (neither of which was squarely adopted by the district court in its opinion). First, Plummer contends that wholly extraterritorial transportation of a Cuban cigar cannot be a crime because mere transportation of a Cuban product is not a "transaction" within the meaning of the statute. Relatedly, he contends that the regulations constitute an unlawful delegation of Congressional power to the extent they seek to prohibit mere transportation of a Cuban product. But these arguments ignore the plain language of the TWEA, which expressly authorizes the President to prohibit not only transactions, but also "<u>transportation</u> . . . of . . . any property in which a foreign

under the CACRs shall remain in effect until a democratically elected government is in power in Cuba).

21

country . . . has any interest." 50 U.S.C. App. § 5(b) (1)(B) (emphasis added). The regulations simply implement this directive with respect to Cuban products.[7]

Second, Plummer asserts that imposing criminal liability based on "carrying a Cuban cigar, anywhere in the world" would be irrational and therefore violate substantive due process. He completely fails, however, to meet his burden of showing that the regulations are not rationally related to any conceivable governmental interest.

Under our substantive due process jurisprudence, a statute or regulation will be upheld so long as it is rationally related to a lawful governmental purpose and is not unlawfully arbitrary or discriminatory. See, e.g., TRM, Inc. v. United States, 52 F.3d 941, 945 (11th Cir. 1995). As we have explained, "'[t]he rational basis test is not a rigorous standard. . . . The test is generally easily met. . . . The task is to determine if any set of facts may be reasonably conceived to justify [the regulation]. Even if the court is convinced that the political branch has made an improvident, ill-advised or unnecessary decision, it must uphold the act if it bears a rational relation to a legitimate government purpose.'" Id. at 945-46 (quoting Cash

---

[7]Plummer seems to suggest that the TWEA's reference to prohibiting transporation has been displaced by the 1996 Cuban Liberty and Democratic Solidarity Act, which Plummer contends "reinforces the notion that wholly extraterritorial 'transportation' cannot be a crime." But we are aware of no evidence that the 1996 Act altered or affected the criminal liability created by the TWEA and the CACRs for transporting Cuban products without authorization.

Inn of Dade, Inc. v. Metropolitan Dade Cty., 938 F.2d 1239, 1241 (11th Cir. 1991) (internal quotation marks omitted)).

In this case, even greater deference is in order. The authority delegated by Congress to the President under the TWEA is extensive. "[B]oth the legislative history and cases interpreting the [Act] fully sustain the broad authority of the Executive when acting under this congressional grant of power." Dames & Moore v. Regan, 453 U.S. 654, 672, 101 S. Ct. 2972, 2974, 69 L. Ed. 2d 918 (1981). The delegation of such broad powers to the President is consistent with the President's constitutionally vested role as the nation's authority in the field of foreign affairs. It is a basic principle of our system of government that, when acting pursuant to Congressional authorization in the field of foreign affairs, the President commands the political authority of the United States. See, e.g., United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320, 57 S. Ct. 216, 221, 81 L. Ed. 225 (1936) ("within the international field" Congress may "accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved"). Conversely, the role of the judiciary in foreign affairs is limited: "Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" Wald, 468 U.S. at

23

242, 104 S. Ct. at 3038 (quoting Harisiades v. Shaughnessy, 342 U.S. 580, 589, 72 S. Ct. 512, 519, 96 L. Ed. 586 (1952)).

Relying on these principles, courts have on several occasions rejected attempts to "second-guess" the CACRs on the ground that the regulations serve no rational purpose in light of changing global or national political priorities. See, e.g., Wald, 468 U.S. at 242, 104 S. Ct. at 3038 (refusing to hear claim that absence of Cuban missile crisis security risk left Cuban embargo without sufficient foreign policy justification); Freedom to Travel Campaign v. Newcomb, 82 F.3d 1431, 1439 (9th Cir. 1996) (sustaining travel ban to Cuba despite argument that "the President's current reason for the embargo -- to pressure the Cuban government into making democratic reforms -- is not as compelling a policy for an embargo as were previous justifications that relied on national security concerns"). Plummer has not met his burden of showing that the statutory and regulatory provisions restricting the unauthorized transportation of Cuban products (including cigars) are wholly irrational or unrelated to any legitimate governmental interest. The transportation of such goods may generate revenue and foreign currency for, and thereby help sustain, a regime that is deemed by the political branches of

government to threaten national interests.[8]  Although Congress and the Executive Branch undoubtedly have the power to revise the TWEA and the CACRs to reflect changed national priorities, and reasonable people may disagree as to whether they should do so now, the fact that they had not done so by the time of Plummer's alleged misconduct does not render those provisions unconstitutional.  In any event, Plummer's "carrying one cigar, anywhere in the world" argument rings hollow given that he has been indicted not for carrying one cigar, but rather for transporting 121 boxes of cigars worth over $50,000 with the intent to smuggle them into the United States.  We therefore reject Plummer's due process objections.

The other grounds for dismissal identified in the district court's opinion are not squarely advanced by Plummer on appeal and do not merit significant discussion.  Contrary to the district court's suggestion, Congressional intent to

---

[8]The Government has long asserted that the purposes underlying the CACRs include "deny[ing] to Cuba or its nationals hard currency which might be used to promote activities inimical to the interests of the United States." Real v. Simon, 510 F.2d 557, 563 (5th Cir.), reh'g denied, 514 F.2d 738 (1975).  As recently as 1996, when it codified and strengthened the embargo by enacting the Cuban Liberty and Democratic Solidarity Act, Congress justified the measure by describing Cuba as a threat to national security and making extensive findings to that effect. See 22 U.S.C. § 6021. Accordingly, we cannot accept Plummer's contention that applying the TWEA to criminalize the transportation of Cuban products such as cigars is no longer rationally related to the TWEA's original goal of promoting national security.  In any event, we are required to consider "any rationale Congress could have had for enacting the statute . . . regardless of whether Congress actually considered that rationale at the time the bill was passed." TRM, 52 F.3d at 946 (citing United States v. Osburn, 955 F.2d 1500, 1505 (11th Cir. 1992) (internal quotation marks omitted)).

25

extend the TWEA to acts occurring outside U.S. territory clearly may be inferred from the language of the statute as well as the nature of the harm the statute is designed to prevent; the international focus of the statute is self-evident, and to limit its prohibitions to acts occurring within the United States would undermine the statute's effectiveness. See Bowman, 260 U.S. at 98, 43 S. Ct. at 41. The fact that the indictment does not expressly allege that an "enemy country or enemy national" had an interest in the cigars allegedly transported by Plummer does not require dismissal; the indictment expressly alleges that the cigars were manufactured in Cuba, an enemy country within the scope of the regulations, and under the regulations a country such as Cuba has an interest in the transportation of goods manufactured within its borders. See 31 C.F.R. § 515.312 ("The term 'interest' when used with respect to property shall mean an interest of any nature whatsoever, direct or indirect"); United States v. Broverman, 180 F. Supp. 631, 636 (S.D.N.Y. 1959) (rejecting similar argument with respect to transactions in hog bristles from China because "it is not necessary that the indictment specify in precise statutory language that China or a Chinese national has an interest in the hog bristles"). Finally, the indictment expressly alleges that Plummer -- a United States citizen -- is a "person subject to the jurisdiction of the United States" within

the meaning of the TWEA.  Contrary to the district court's analysis, that allegation suffices regardless of where Plummer was apprehended.

In short, we conclude that the district court erred by dismissing both Count I and Count II.  We reverse the district court's dismissal of the indictment, and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**